Theodore W. Seckendorff, Respondent, *v.* Halsey, Stuart & Co., Incorporated, Appellant, Impleaded with A. B. Leach & Co., Inc., and Others, Defendants.

First Department, December 18, 1931.

*Edward K. Hanlon* of counsel [*Beekman, Bogue & Clark,* attorneys], for the appellant.

*George Gordon Battle* of counsel [*Benjamin F. Spellman, Ludlow S. Fowler* and *Pearson E. Neaman* with him on the brief; *Battle, Levy, Van Tine & Fowler,* attorneys], for the respondent.

MERRELL, J. Plaintiff, at the time of the trial, was a man of the age of fifty years, and for many years had been connected with the organization of the New York *World* newspaper, in charge of its financial advertising department. In such work plaintiff had obtained an acquaintance with many investment houses and banking institutions on Wall street and elsewhere in the city of New York. Plaintiff was born in the city of New York and resided there until he was three years of age when his parents took him to Washington, D. C., where he resided until he left college, and thereafter was a frequent visitor at Washington, his parents and sister residing in said city. Plaintiff was acquainted with a lecturer by the name of Colonel Bulkley in Washington, and learned from him that a man by the name of Nassauer was desirous of obtaining financial assistance in connection with certain properties in the city of Washington controlled by one Harry Wardman, and known as the Wardman properties. Plaintiff himself was familiar, in a general way, with these properties, which were extensive, consisting of several apartment hotels and other valuable real estate in said city. Plaintiff and his friend Bulkley conceived the idea that they, and particularly plaintiff, could be of assistance to Nassauer in obtaining the necessary financial aid from New York investment houses. Bulkley suggested that plaintiff meet Nassauer, which he eventually did, being introduced by Bulkley, and there was a discussion with reference to the desired financial aid which Nassauer sought to obtain in connection with said Washington properties. Nassauer arranged with plaintiff that he might take up the matter with certain investment banking houses in the city of New York in an effort to obtain such financial assistance. Plaintiff was to have twenty-four hours in which to approach said banking institutions. Plaintiff knew of a corporation known as Rogers Caldwell & Co., Inc., and at once called upon said investment house and there met a Mr. Hocart, secretary of Rogers Caldwell & Co., Inc., and asked Hocart if his corporation would be interested in financing a real estate proposition somewhere in the neighborhood of Baltimore or Washington, mentioning the name of Harry Wardman. Hocart intimated that his corporation might be interested and asked for

figures, stating that he would take up the matter with a Mr. Weber, who was the head of his banking house. Plaintiff left Hocart a number of memoranda showing valuations, earnings, etc., of the properties proposed to be financed, and received from Hocart a promise that he would later communicate with plaintiff upon the return of Mr. Weber, his chief, who was then absent from the city. Within three or four days Hocart called up plaintiff and arranged an interview between plaintiff and Weber. Plaintiff went to the office of Rogers Caldwell & Co., Inc., accompanied by Nassauer. The latter suggested the financing of various Washington properties, and there was some discussion with Weber with reference to the valuations and earnings of the properties. It was also stated that, if the properties suggested were not satisfactory and could not be financed, other properties owned or controlled by Wardman could be put into the deal. At that time Wardman appears to have been the owner of a large amount of real estate in and about the city of Washington, or of an equity therein. Following this initial interview, others were had between plaintiff, Nassauer and Weber. Some of the interviews were between Nassauer and Weber, and in others the plaintiff, respondent, participated. During these interviews Weber was furnished with a report on various Wardman properties in the city of Washington, which report had been prepared by the engineering firm of Ford, Bacon & Davis. Plaintiff also obtained and supplied to Weber an airplane photograph of the Wardman properties taken by Fairchild & Co., experts in aeronautical photography. He also obtained and furnished a report prepared by Ernst & Ernst, a firm of certified public accountants, with reference to the existing buildings on the proposition contemplated and in addition with reference to certain structures proposed to be erected thereon. In February, 1927, Weber apparently had become convinced that the proposition could be financed and sought a meeting with the Wardman interests. In response to his request a man by the name of Hobbs, who was then vice-president and treasurer of various Wardman corporations in Washington, came to the city of New York and was introduced by plaintiff to Weber. Several conferences then ensued in which Weber and Hobbs discussed the properties and possible methods of financing the same. The proposal then being considered was to put out an issue of gold debenture bonds to the amount of $22,000,000. This issue was to be based on the consolidation of various properties owned by Wardman and others of which it was thought the Wardman interests could obtain control. Indeed, some of the properties then under consideration were not owned by the Wardman interests. However, the Wardman interests

seemed to own several of the parcels. Included in the list put out by Ford, Bacon & Davis were the Southern Building and Meridian Mansion in Washington, neither of which at that time was owned by the Wardman interests. It appears that at this time the actual properties to be put into the proposition were not at all definite but were known generally as Wardman properties. Hobbs testified that the plan of financing considered by Weber and himself varied as did the properties embraced in such plan. Matters seem to have progressed to an extent that it was thought by Weber of Rogers Caldwell & Co., Inc., that the matter would be carried to a successful termination, and on March 8, 1927, Weber, evidently feeling grateful to plaintiff for having brought the attention of his corporation to the opportunity of financing this extensive deal, told respondent that he proposed to write him a letter so as to protect respondent's interests in the deal. Prior to that time respondent had inquired of Weber if the respondent would be paid a commission for finding this business, and was answered in the affirmative. On the letterhead of Rogers Caldwell & Co., Inc., on March 8, 1927, the following letter was signed by Weber, as vice-president of Rogers Caldwell & Co., Inc., and delivered to the plaintiff, respondent:

" ROGERS CALDWELL & CO., INC.
" Investment Securities
" Telephone Rector 3068
" 150 Broadway

" CALDWELL & COMPANY
" Nashville, Tenn.
" Offices in
" Principal Cities

" NEW YORK, N. Y., *March* 8, 1927.

" Mr. THEODORE SECKENDORFF,
" Stratford House,
" 11 East 36th Street,
" New York City.

" My dear Mr. SECKENDORFF: We are pleased to advise you that we, together with such associates as we may select, are interested in considering the proposed financing of the consolidation of so-called Wardman properties in Washington, D. C., which you brought to our attention.

" In the event of our financing the same, we and our associates will pay you as an originating commission 1% of the par value of such securities of the consolidated company as we may purchase for distribution to the public, and 2% of any securities of the consolidated company we may receive as bonus for handling the transaction. The payments referred to are to be made to you

upon termination of such syndicate as we and our associates may form.

"It is understood, however, that if the deal should not materialize or should we decide for any reason whatsoever not to proceed therewith, we shall not be liable to you for the payment of any commissions whatsoever.

"Assuring you that we are pleased to have you associated with us in this matter and trusting that the deal will prove mutually profitable, we are                    Very truly yours,
                              "R. H. WEBER,
"RHW:KM"                              "*Vice-President.*"

It will be noted that in this letter Weber refers to the properties to be embraced in the financing scheme as the "so-called Wardman properties in Washington, D. C." Prior to writing this letter Weber had inquired of plaintiff as to whether he could suggest a house suited to head a syndicate on a bond issue of $22,000,000. Respondent suggested Halsey, Stuart & Co. or Lehman Brothers as proper houses to head the syndicate. Weber agreed to approach Lehman Brothers on the subject and on doing so was informed by them that they were not interested in the proposition. Weber then called on Mr. C. B. Stuart, vice-president of Halsey, Stuart & Co., late in March, 1927, and explained to him the Wardman proposition, giving to Stuart the names of four or five of the properties proposed to be included. Stuart was interested and agreed to send over a representative from the buying department of Halsey, Stuart & Co. to obtain all the information possible. Mr. R. T. Reeve, a junior in the buying department of Halsey, Stuart & Co., whose function, as testified to by Stuart, was "to find deals and negotiate them into position where they can be sent over to the sales department and sold to the public," was sent by the defendant, appellant, to look into the matter. Reeve testified that he was instructed by Stuart to see Weber about a piece of new business, and called upon Rogers Caldwell & Co., Inc., in March, 1927. At the first meeting there was a brief discussion between Weber and Reeve concerning the matter, but the details were left to a later conference, which was arranged between them. A second conference was held shortly thereafter, at which the plaintiff, respondent, was present. At this conference Weber showed to Reeve a file of the whole matter containing data and figures regarding the various buildings to be included, such as valuation, rents received, and other naterial matters. There was included in this file a carbon copy of the letter written by Weber to plaintiff on March 8, 1927. In this letter plaintiff's compensation

was fixed at one per cent of the par value of securities of the consolidated company as might be purchased for distribution to the public, and two per cent of any securities of the consolidated company which might be received as bonus for handling the transaction. According to the testimony of plaintiff, Reeve looked at the letter and remarked to plaintiff: " You are making quite a profit out of the transaction." To this plaintiff replied that he thought he was entitled to it as the deal was a large one. Reeve nowhere denied this conversation. He, however, pleads lack of memory with reference thereto. When Reeve left the conference the papers were delivered to him at his request to be taken to the office of Halsey, Stuart & Co., from which he would make a report and later return the papers to Weber. The court charged the jury as one of the issues of fact that in order for plaintiff to recover, the jury must find that this letter, promising plaintiff his compensation, was brought home to Halsey, Stuart & Co. and that they knew of its existence when they finally entered into the financing deal in association with Rogers Caldwell & Co. We think there was evidence sufficient to justify the jury in finding that this letter was shown to Reeve and to justify the presumption that Reeve showed the same to or informed Stuart of Halsey, Stuart & Co. of its contents. Stuart admitted on the witness stand that it was a matter of great importance what, if any, commissions were to be allowed to the finder of this business. But it seems to us, beyond all this, that Rogers Caldwell & Co. and Halsey, Stuart & Co. were, in reality, partners or, at least, joint adventurers, and that Rogers Caldwell & Co. could legally bind its associates, Halsey, Stuart & Co., later associated with it in the enterprise of financing the Wardman properties, by the agreement in the letter in question.

The evidence clearly shows that Reeve and Weber discussed various questions presented by the data before them. It appears from a report subsequently made by Reeve that six properties were discussed in detail to be included in the financing proposition, and also that one or two other properties were discussed as possibilities, and which properties, according to Reeve's recollection, were to be acquired from someone else and put into the deal. Reeve admits that after he took the papers from Weber he conferred with Stuart with reference thereto, and that subsequently he prepared a written report which was introduced in evidence as plaintiff's Exhibit 7, and submitted the same to Stuart, who examined said report. This report is entitled, " Wardman Washington, D. C. Properties," and by the subtitle, " Wardman Real Estate." This set-up proved unsatisfactory to Halsey, Stuart & Co., and in Reeve's handwriting at the bottom of his report we

find this notation: " We passed on basis of too much construction and too large a proportion apartment hotel." Plaintiff, however, seems to have been undaunted by the turning down of the original proposition and set-up and continued his conferences with Weber of Rogers Caldwell & Co. Weber attributed the failure to carry out the proposal to the fact that certain figures received from Ernst & Ernst, certified public accountants, would not justify a large issue of bonds by reason of the lack of earning power of the properties. Weber then suggested that they wait a year before attempting to issue the bonds, in order to demonstrate the earning power of the properties. Nassauer suggested a plan of financing through land trust certificates, a form of financing in vogue in the west based upon land values alone, and not upon buildings on the property. Weber was unfamiliar with such form of financing and asked Hocart and plaintiff to confer with other banking houses and get some particulars on issues of that sort. Subsequently Weber took up the matter with several investment houses, and finally, in April or early May, 1927, instructed his attorney to prepare an option agreement to carry out the land trust proposition. Prior thereto, however, Weber told respondent that he must give up that portion of his compensation as was measured by the bonus stock upon which plaintiff was to receive a two per cent commission. The respondent demurred to surrendering such part of his compensation, but was finally induced to do so. To carry out such agreement Weber had prepared a letter addressed to his corporation and signed by the respondent. This letter reads as follows:

" *May* 11, 1927.

" Messrs. ROGERS CALDWELL & COMPANY,"
  " 150 Broadway,
    " New York, N. Y.
  " GENTLEMEN: In consideration of your continuing the negotiations referred to in your letter to me dated March 8, 1927, it is agreed that the contingent compensation to which I shall become entitled under the circumstances set forth in that letter shall be modified to exclude any stock whatever, so that my ultimate compensation when earned shall be limited to the percentage of cash set forth in said letter.

" Yours very truly,
" S /s."

It thus clearly appears that Weber understood that Rogers Caldwell & Co. and their associates in case there was any financing carried through, were bound to pay plaintiff his one per cent commission specified in the original letter of March 8, 1927. This

letter of May 11, 1927, clearly left unaffected plaintiff's cash commission of one per cent for originating the business. The two letters of March eighth and May eleventh clearly show knowledge on the part of Rogers Caldwell & Co., at least, of the respondent's claim for originating the business, and that the efforts were to be continued and carried on concerning various and varying properties and through differing methods of financing. The option agreement embraced in the issuance of land trust certificates covered the purchase of $8,100,000 of land trust certificates secured by seven of the Wardman properties. Plaintiff was informed by Weber that this was merely a temporary financing, and that eventually other properties belonging to the Wardman interests would be included, and that they would be able to put through a bond issue when the earnings justified it, and that he believed the deal could be put through. About this time the respondent asked Weber to write a letter to Mr. Newbold in Washington, who was financing respondent, with reference to the probability of putting the deal through. Weber was so sanguine of ultimate success that he gladly acquiesced in such request, and wrote Newbold the following letter: "*June* 17, 1927.

" Mr. FLEMING NEWBOLD,
    " The Washington Star,
        " Washington, D. C.
    " My dear Mr. NEWBOLD: Our very good friend Waldemar Seckendorff has confidentially advised me that you are interested in the possibility of the Land Trust Certificate issue, which he originated, materializing, and I take great pleasure in advising you that at the present time the Bankers (which includes ourselves) having the option contemplate exercising the same some time within the next two weeks.
    " While the exercising of the option does not constitute the actual closing of the deal, the latter usually takes place some six weeks thereafter; and distribution of profits customarily takes place upon the termination of the syndicate, at which time, I am pleased to say, Mr. Seckendorff will make a very handsome profit.
                                " Yours very truly,
                                    " R. H. WEBER,
                                        " *Vice-President.*
    " RHW /s."

Under its terms the land trust agreement, which was dated May 14, 1927, expired in six weeks, on June 25, 1927. On June tenth the option in effect was modified by eliminating one of the pieces of property known as Cathedral Mansions, and the amount of the proposed loan reduced from $8,100,000 to $4,600,000. However,

this deal finally fell through. Following this failure, Weber still assured plaintiff, respondent, that when the bond market improved and he thought in the following fall, the conditions would be better, and the desired financing could be carried through. Weber went abroad in August, returning some weeks later. So far as the evidence discloses, from then on, plaintiff heard nothing concerning the financing of the Wardman properties until October, 1928, when he saw an advertisement in the newspapers advertising a $11,000,000 first and refunding mortgage six and one-half per cent serial gold bond issue, covering "Wardman Real Estate Properties, Inc.," and which bond issue was secured by several of the properties considered in the original set-up. This advertisement was signed by Halsey, Stuart & Co., by Rogers Caldwell & Co., Inc., and two or three other investment houses. It transpired that, without the knowledge of plaintiff, in March, 1928, Mr. C. B. Stuart, who had previously considered the respondent's proposition to finance a consolidation of the Wardman properties, had received a telephone call from the Baltimore house of Hambleton & Co. with regard to the financing of the Wardman properties. When the representative of Hambleton & Co. called Stuart, the latter replied, " As far as Halsey, Stuart & Co. is concerned, we heard of this deal in the office before." I think this statement by Stuart clearly indicates that he had knowledge of the original set-up with reference to this financing. Stuart wrote his brother on March 23, 1928, at Chicago, Ill., in regard to the proposition of Hambleton & Co. about a bond deal covering the Wardman properties in Washington, D. C., and suggesting that there were possibilities in the proposition, as the Wardman outfit had an excellent reputation, and that the new proposition was to have at its head a man by the name of Coblenz, of unquestioned standing and ability in financial circles, and stating, finally, " Mr. Coblenz will have a personal interest in the new set-up." When confronted with this letter on the witness stand Stuart was unable to explain what was meant by this expression, " new set-up," and disclaimed any recollection whatever in regard to the first set-up. We think the jury was justified in finding from this letter and from the testimony of Stuart that when he spoke of a new set-up he had in mind the original set-up which had been examined by Reeve and reported to him. Finally, an agreement was entered into September 15, 1928, wherein twelve pieces were consolidated by transferring them to the Wardman Construction Company, a new corporation, which in turn transferred them to the Wardman Real Estate Properties, Inc., also a new corporation. All of the stock of the Wardman Real Estate Properties, Inc., was held by the Wardman

Construction Company, and all of the stock of the construction company was in turn held by the properties company. However, the stock of the construction company was placed in a voting trust with such voting trustees and on such terms and for such duration as the bankers might decide. All of the class A stock of the latter company was sold to the bankers. Under the agreement Halsey, Stuart & Co. and Hambleton & Co. purchased $11,000,000 of bonds of the properties. Halsey, Stuart & Co.'s interest in the purchase was sixty-five per cent, while that of Hambleton & Co. was thirty-five per cent. In August, 1928, Stuart communicated with an officer of Caldwell & Co., whom the jury, under instructions from the court, found to be identical with Rogers Caldwell & Co., inclosing two circulars of the bonds and debentures proposed to be issued, and on September 12, 1928, Halsey, Stuart & Co. confirmed to Rogers Caldwell & Co. a twelve and one-half per cent interest in the $11,000,000 of bonds of the Wardman Real Estate Properties, Inc., and in addition $2,500,000 debentures of the Wardman Construction Company, conveying a one-eighth interest in the transaction. We think by these acts Halsey, Stuart & Co. clearly associated itself with Rogers Caldwell & Co. in financing a consolidation of the so-called Wardman properties, and that both companies were brought squarely within the terms of the letter with reference to the commissions to be paid to plaintiff for originating the business, and which Reeve, of Halsey, Stuart & Co., had stated would result in a handsome profit to plaintiff.

It is urged on the part of appellant that this deal which was carried through was entirely separate, distinct and different from the deal and set-up contemplated at the time plaintiff took up the matter originally with Weber. It seems to us that that is a matter of no materiality whatever. Plaintiff was in nowise a broker. He knew nothing about the values of real estate. He knew nothing whatever of the set-ups that were made. He merely was a finder of this piece of business. He was to receive his compensation for finding the business and bringing the same to the attention of Rogers Caldwell & Co. and its associates. He claimed his compensation solely upon the ground that he was the originator of the business and had disclosed to Rogers Caldwell & Co. and its associates the opportunity to engage in this financing. Except for the fact that plaintiff himself had discovered this opportunity there never would have been any bond issue with reference to the Wardman properties. Plaintiff himself was alone responsible for finding this business and discovering it to defendants. The details of the financing or the properties included, so long as they were

so-called Wardman properties, were of no concern to plaintiff. All that plaintiff was bound to show was that the final deal which was carried through flowed directly from his introduction of the matter to Rogers Caldwell & Co. The court, in a very careful charge, left it to the jury to say whether or not, upon the evidence, the deal that was made resulted and flowed directly from the original disclosure by plaintiff to Rogers Caldwell & Co. The deal ultimately accomplished was the financing of a consolidation of so-called Wardman properties in Washington, D. C. This opportunity was brought to the attention of Rogers Caldwell & Co. and Halsey, Stuart & Co. by plaintiff.

Several questions of fact were presented to the jury for determination in an extremely fair charge by the trial court. Certainly the court, in its charge, did not favor plaintiff, but, rather, seemed to emphasize the defendants' contentions. Indeed, the court, in instructing the jury at one point, stated: " There is no evidence in this case of any fraud or bad faith on the part of defendant Rogers Caldwell & Company or Halsey, Stuart & Company toward the plaintiff." We think this charge was extremely favorable to defendants, and while it became the law of the case, and the plaintiff, not excepting thereto, is bound thereby, nevertheless, we think there is evidence in the case from which the jury might have found bad faith on the part of defendants.

The court, in its charge, left it to the jury to determine whether or not Caldwell & Co. and Rogers Caldwell & Co. were, in fact, one and the same. The jury found that they were, and, under the evidence, it was justified in so finding. The court also left to the jury to say whether Halsey, Stuart & Co. became associated with Rogers Caldwell & Co. with the knowledge on its part that Rogers Caldwell & Co. had promised to pay respondent the commission mentioned in the letter of March 8, 1927, on behalf of itself and its associates. We think there is sufficient evidence justifying the jury finding such to be the fact. The court also left it to the jury to say whether the deal which was finally consummated had reference to the so-called Wardman properties in Washington, D. C., within the contemplation of the parties, and as to whether the deal which was finally consummated was a financing within the contemplation of the parties within the agreement of March 8, 1927. The court also left it to the jury to say whether or not the financing occurred within a reasonable time after March 8, 1927, when plaintiff's commissions were fixed, and as to whether the financing which was ultimately carried through flowed directly from the information submitted by plaintiff.

As to whether there was a direct connection between the final

set-up that was carried through and the initial effort that was sponsored by Rogers Caldwell & Co., we have no doubt that the evidence was sufficient to justify the jury in finding that the final financing flowed directly from the original effort. Stuart, when the final set-up was broached to him, recognized that it concerned the same general Wardman properties involved in the original. When he wrote his brother of the "new set-up" he knew of the first set-up, and that both concerned the same Wardman properties. The appraisal for the final set-up was made by the same firm of appraisers, Ford, Bacon & Davis, that had acted as appraisers on the first set-up. Finally, when the defendant, appellant, had concluded to float the $11,000,000 bond issue it sought out from a multitude of investment houses the same Rogers Caldwell & Co. that had endeavored to put through the original proposition to finance these properties, and confirmed to Rogers Caldwell & Co. a twelve and one-half per cent, or one-eighth, interest therein. We think the jury was justified in finding that the defendant, appellant, was an "associate" of Rogers Caldwell & Co. in the final set-up and under the letter of March 8, 1927, was obligated to pay the man who "found" this business.

The court also left it to the jury to say whether or not, within the law, plaintiff was a real estate agent and as to whether his failure to obtain a license to practice as such barred a recovery. The jury found, by the verdict, that he did not occupy such position, but was merely the finder or originator of the business. We think, on all of these propositions, there was sufficient testimony to go to the jury, and that the jury was justified in returning the verdict in favor of plaintiff and against the two defendants in the sum of $110,000, being one per cent on the $11,000,000 of the bond issue.

The judgment and order appealed from should be affirmed, with costs.

FINCH, P. J., SHERMAN and TOWNLEY, JJ., concur; O'MALLEY, J., dissents.

O'MALLEY, J. (dissenting). The verdict of the jury on the main issue litigated was not only against the weight of, but contrary to, the credible evidence. I am unable to discover the slightest evidence of fraud or bad faith on the part of the appellant and the court's charge relieved it of even the implication of either. The charge in this respect was fully justified and, no exception thereto having been taken, it became the law of the case.

I, therefore, vote for reversal and a dismissal of the complaint.

Judgment and order so far as appealed from affirmed, with costs.