VEATCH et al. v. STANDARD OIL CO. OF CALIFORNIA.
No. L–69–319.

District Court, S. D. New York.
April 15, 1940.

Guggenheimer & Untermyer, of New York City (Abraham Shamos and Mitchell Salem Fisher, both of New York City, of counsel), for plaintiffs.

Dwight, Harris, Koegel & Caskey, of New York City (Ralph S. Harris, Frederick W. P. Lorenzen, and Loren C. Berry, all of New York City, of counsel), for defendant.

LEIBELL, District Judge.

This is a motion, with supporting affidavits, for a summary judgment under Rule 56(b), Federal Rules of Civil Procedure, 28 U.S.C.A. following section 723c, in favor of the defendant as to the claim asserted by plaintiffs. The claim is set forth in paragraph "2" of the complaint as follows: "2. Between about January 18, 1934 and about June 1, 1934, the plaintiffs rendered services to and for the benefit of the defendant in procuring a purchaser for petroleum and petroleum products. Said services were rendered at the request of and were accepted by the defendant, and the defendant agreed to pay the plaintiffs the reasonable value thereof. Upon information and belief, the reasonable value of said services was the sum of eight hundred forty-three thousand eight hundred nineteen and 60/100 dollars ($843,819.60). No part of said sum has been paid, although payment has been duly demanded."

From the affidavits and exhibits submitted on this motion, the following appears to be a fair summary of the facts: In January 1934, plaintiff Hanover received a letter from Martin Sain, managing director of a Roumanian corporation, known by its abbreviated title as "Redeventza". The letter, written in Roumanian, dated December 22, 1933, contained a general survey of Redeventza's oil business and a statement that during the year 1934, Redeventza expected to market some 200,000 tons of refined petroleum products over and above the capacity of its own refineries, which excess would be acquired "either at our own domestic market, or direct from America or Russia". In outlining certain plans for the future, it was stated that a refinery for the middle of Europe was being planned and that "It is therefore more than probable that we would require crude oil for our refinery and we will import such from America".

Hanover brought this letter to Veatch, who died since this action was started. Veatch was a geologist and at the time was engaged in the oil business, principally as an operator of producing properties. On January 18, 1934, Veatch sent the Roumanian letter to James B. Moffett at New York City and Veatch's letter of transmittal characterized the Redeventza letter as "indicating that that company would like to make a connection with an American company to supply it with oil products and crude". It continued as follows: "It has occurred to me that this might be of interest to the Standard of California in view of its accentuated interest in European marketing arising from its successful development in the Persian Gulf, and I am accordingly sending it to you for your consideration, with Mr. Hanover's translation. Should it prove of interest and business between yourselves and Redeventza result therefrom, I would expect from the business developed a reasonable return for myself to be shared with Mr. Hanover."

The development in the Persian Gulf, referred to by Mr. Veatch, was that of a new field being exploited on Bahrein Island in the Persian Gulf by Bahrein Petroleum Co., Ltd., a subsidiary of defendant, Standard Oil Company of California. Commercial production on this field, however, did not commence until June 1934 and samples were not available until about a month later.

When the Redeventza letter was forwarded to his office in New York, Mr. Moffett was not, nor had he been in the past, an officer of defendant, Standard Oil Company of California. He had informally accepted a position as Vice-President of the company and was on his way from Florida to San Francisco to complete formal arrangements with respect thereto. On Jan-

uary 21, 1934, in San Francisco, his designation as Vice-President was made effective retroactively as of January 15, 1934. It was contemplated that his duties would include the formulation of a plan for the development of a refinery on Bahrein Island, in addition to the supervision of marketing facilities for the distribution of Bahrein petroleum east of Suez.

Mr. Moffett was absent from New York on January 18, 1934, when Veatch forwarded the Redeventza letter to him. Miss R. M. Holland, Mr. Moffett's private secretary, received the letter and on January 22, 1934, she wrote Veatch from Moffett's apartment in New York City, acknowledging receipt of the letter and advising him that Mr. Moffett would not be in New York for ten days or two weeks. Miss Holland forwarded the letter to Mr. Moffett in California. Veatch did not hear from Moffett and on February 20, 1934, wrote him and requested a return of the Redeventza letter in the event that Moffett had had an opportunity to consider the matter and found it of no interest. Miss Holland replied to this on February 26 stating that the Veatch letter of January 18 and enclosures had been forwarded to Moffett in California; that he had returned to New York with the letter in his papers to be taken to Europe; that she was sorry he had the papers with him if Veatch wished them returned immediately; that if there was anything Veatch wished her to do about it he should telephone her, otherwise she would wait until Moffett returned from Europe about April 1 and have him get in touch with Veatch at that time. Veatch acknowledged Miss Holland's letter on March 2 and stated that the fact that Moffett had taken the papers to Europe would indicate that the matter was of interest to him at that time and that in due course Veatch would hear from Moffett. About March 20 Hanover advised Redeventza of the above correspondence and described the business and standing of the Standard Oil Company of California.

On April 25, 1934, not having heard from Moffett, Veatch wrote him, and after having reminded him of the earlier Redeventza letter (December 22, 1933) stated that Hanover had reported to Redeventza that Veatch had submitted the matter to Moffett and that Hanover had received another letter from Martin Sain of Redeventza, dated April 6 to the effect that "he (Sain) would welcome a mutually satisfactory arrangement with your company to supply Redeventza's needs as indicated above". In concluding Veatch again requested Moffett to advise him whether or not such a possible arrangement with Redeventza was of interest to Moffett's company (the defendant).

Miss Holland also received this April 25 letter and on April 26 she telephoned Veatch advising him that Moffett was then en route from California to New York and would arrive in New York on Monday, April 30, and she asked Veatch if that would be soon enough for Moffett to attend to the matter. On May 2, in response to a call from Veatch, Miss Holland informed him that Mr. Moffett had reached New York on Monday, had gone to Washington and had returned from Washington that morning and was sailing for Europe at midnight; that she expected to see him about noon and would bring the letter to his attention. On May 3 Veatch again talked with Miss Holland on the phone and Veatch quotes Miss Holland as saying that, although she had not seen Mr. Moffett personally the day before, she spoke to him about noon regarding Veatch's letter of April 25; that Moffett directed her to send the letter to him at his home, saying that it was a matter that he would attend to on the other side and that he would communicate with Veatch from the boat. Veatch suggested to her that he would cable the Redeventza people that Moffett would take care of the matter when he arrived in Europe and "she said that she thought that would be a very good idea."

On May 4, 1934, Hanover cabled Martin Sain with regard to Moffett's trip to Europe and suggested that Sain get in touch with Moffett at the Claridge Hotel, London, and added "we have advised him you would welcome mutually satisfactory arrangement". A night letter cablegram was sent to Moffett at the Claridge by Veatch May 8 stating that after conversation with Moffett's secretary Veatch had the Hanover cable sent to Sain, and quoted it. The Veatch night letter then concluded —"It would be a courteous gesture if you would telegraph Sain indicating you would be glad to see him for purpose of determining whether some mutually satisfactory arrangement is possible and suggesting meeting place convenient to yourself".

On May 22, 1934, Sain wrote Hanover from Bucharest and stated that the May 4 cable had arrived in Bucharest while Sain

was away and that Sain received it after he had left London for Paris; that Sain then telegraphed Moffett to inquire whether Moffett was coming to Paris and that Moffett could not come, "so I (Sain) had to renounce this meeting, which, undoubtedly, I also consider, it would have been very interesting for both parties". No meeting did take place and, so far as the record shows, this was the last communication between plaintiffs and any officer or employee of defendant until March 3, 1936, when Veatch addressed a letter to Mr. Moffett stating that Hanover had been advised "that the business with Redeventza brought to your attention by ourselves has materialized". The letter asked Moffett to advise Veatch "regarding the business that has eventuated between Standard of California and Redeventza, and the return to Mr. Hanover and myself due thereon".

Plaintiffs contend that from certain facts that will now be stated plaintiffs are entitled to conclude that the defendant, Standard of California, used the information contained in the letter of Redeventza dated December 22, 1933, which Veatch sent Moffett on January 22, 1934, and which was forwarded to Moffett in California by his secretary while he was there in conference with officials of the defendant. It appears that a Mr. Green of E. A. Gibson & Co. Ltd. of London was in California in conference with defendant's officers in April 1934 and later crossed on the same boat with Moffett to England, sailing May 4, 1934. Green opened negotiations with Redeventza at least by August, 1934. The uncontradicted affidavit of Green and the documentary records indicate that because of a drop in the price of American crude oil at Texas ports and the placing of eight cargoes of Iraq oil in the European market, Green was unsuccessful in his efforts to sell Bahrein crude oil to Redeventza in the fall of 1934. The negotiations came to an end in November 1934 without a sale being made. The situation was relatively quiet until May 1935 when there was an exchange of correspondence between a French Redeventza company and the defendant and defendant's special representative in Europe, a Mr. Beranger, of Paris. Nothing came of these negotiations. Again in August, 1935 E. A. Gibson & Co. Ltd. resumed negotiations with Belgian Redeventza and the first cargo of 10,000 tons of Bahrein crude oil was sold to the Belgian Redeventza Company, September 5, 1935, by Green's company, E. A. Gibson & Co. Ltd. Pursuant to a contract of that date a total of 78,174.54 barrels was shipped, for which E. A. Gibson & Co. Ltd. were paid a commission of one cent a barrel, $781.75, on October 1, 1935. Two other sales were made of this Bahrein oil to Belgian Redeventza by other brokers or agents. About November 22, 1935, a sale of 85,000 to 100,000 tons of Bahrein crude oil to Redeventza, deliveries to be made throughout 1936, was arranged through Bowring Hardy & Co. Ltd., and the contract therefore was finally signed December 9, 1935. In fulfillment of that contract the Bahrein Petroleum Company, Limited, shipped to the Belgian Redeventza Company between December 1935 and November 1936 a total of 745,548.67 barrels, on which a commission of one cent a barrel was also paid. In March 1936, through a ship broker, H. P. Drewry & Co., the Bahrein company was able to sell 30,000 additional tons to the Belgian Redeventza on which no commissions were paid, because the Drewry Co. got certain returns on the shipping contract. Under that sale there were shipped by the Bahrein Petroleum Company, Limited, to the Belgian Company, 267,739.63 barrels of Bahrein crude oil between June 1936 and January 1937.

Defendant, through its officers, contends that neither Moffett nor any officer of defendant saw the Veatch correspondence; that its Paris representative Beranger himself knew of Redeventza's plans and requirements; and that E. W. Lounsbury & Co. of New York on January 27, 1934, wrote defendant at its New York office enclosing a copy of a letter from Redeventza of Paris asking if Lounsbury could secure from an American refinery a permanent supply of gas oil having certain specifications and that Lounsbury also forwarded another Redeventza letter of March 1934 asking quotations on crude oil of certain specifications. Green also denies that anyone communicated to him any of the information contained in the Veatch letter and its enclosure. For the purposes of this motion I assume that the defendant's officers did see the Veatch letter of January 18, 1934, and its enclosure.

Although paragraph 2 of the complaint quoted above pleads a contract of employment, yet plaintiff's bill of particulars with the correspondence and memoranda thereto annexed, and Veatch's deposition de bene esse plus Hanover's affidavit, clearly

show there was no contract of employment of plaintiffs or either of them by the defendant, either express or implied. All that is shown is an effort on the part of plaintiffs "to count themselves in" on some oil business that was likely to eventuate because of defendant's development of the Bahrein Island fields and Redeventza's construction of a refinery in Belgium. Not a letter or a word of encouragement did plaintiffs receive from any officer or responsible representative or agent of defendant. Plaintiffs seek to build their case upon their own volunteered, weak and fruitless efforts and the courteous notes and phone chats of a punctilious and considerate private secretary, who manifestly lacked authority to bind either Moffett or the defendant.

■ Further, plaintiffs cannot spell out any contract of employment, or any right to commissions as a broker, from the failure of Moffett to return the Redeventza letter of December 22, 1933. There was nothing said in Veatch's letter of January 18, 1934, about returning the Redeventza letter, if it did not prove of interest. Moffett swears he does not know what he did with the letter, and he was unable to return it. Its return was not requested by Veatch until February 20. The December 22, 1933, letter may have had some value to the plaintiffs, but any damage resulting to plaintiffs by reason of the failure of Moffett to return the letter would have to be measured in some other way than by allowing commissions on the business the defendant's subsidiary later transacted with Redeventza. A claim to the commissions could be properly based only on a contract of employment, express or implied, and not on Moffett's alleged tortious conduct in failing to return the letter.

The Redeventza letter of December 22, 1933, had been submitted by Veatch to L. F. Rothermal, who was setting up an oil company at Houston, at the suggestion of A. C. Woodman, an oil man at Philadelphia, but they were not interested in its contents. If the Redeventza letter had been peddled about in that fashion (and Veatch's letter of January 18, 1934, so indicates) its possession could hardly involve any very secret or unique information. Moffett's statement that it did not interest him is shown not only by his indifference to the Redeventza proposition referred to in Veatch's letter of January 18, 1934, but by Moffett's failure to take any notice of another paragraph in the Veatch letter, reading as follows: "I have another matter bearing on the European oil situation, which I believe is of much greater importance to the Standard of California than the above, and if you will telephone me (Rector 2-2719) I will be glad to meet you at a time and place convenient to you." Not even this other matter "of much greater importance" received as much notice as a telephone call from Moffett.

Nor could the statement in Veatch's letter to Miss Holland dated March 2, 1934—"The fact that Mr. Moffett took them to Europe with him would indicate that the matter was of interest to him at that time and that in due course we will hear from him"—form the basis of any implied contract of employment of plaintiffs by defendant. And the fact that it went unanswered does not give it any added weight.

■ Plaintiffs argue (although they do not plead it) that the disclosure to defendant that Redeventza was a prospective customer was accompanied by a request for compensation; that defendant in order to negate any implied promise to pay for the information should have written a rejection, so as to leave plaintiffs "free to go elsewhere"; that defendant did not formally reject the proffered information but in fact used it. Plaintiffs also claim that the further communications they received (Miss Holland's letters in January and February and telephone talks with her in March and April 1934) so encouraged plaintiffs that they sent further letters and telegrams and continued their services up to May 8, 1934. Plaintiffs therefore urge a "promissory estoppel". There is no promissory estoppel here. There was no promise made by defendant; there was no statement made by plaintiffs, at the time of the alleged promise, of any action or forbearance on the part of plaintiff, the alleged promisee, which would, when done or forborne by plaintiffs, give rise to a promissory estoppel. In the cases of "promissory estoppel", which have been enforced by the court, it appears that the alleged promise has been an express promise in specific terms and the action or forbearance of the promisee has resulted in some substantial detriment to the promisee, and that such detriment was either intended by the promisor or else "he should reasonably have expected such detriment would be incurred"—Williston on Contracts (Revised Edition) Vol. 1, p. 502, § 139. There was

nothing in Veatch's letter of January 18, 1934, to advise Moffett either of any action plaintiffs would take or of any forbearance on their part, assuming there was on Moffett's part a promise of any kind, express or implied. There was nothing in Veatch's letter of January 18, 1934, from which Moffett or defendant should have reasonably expected Veatch to do or to refrain from doing anything. The facts in this case disclose no injustice to plaintiffs which requires the application of the doctrine of promissory estoppel, assuming arguendo that the requisite basis of a promise and a detriment were present originally.

Of course, plaintiffs were free to go elsewhere with their information; they were not bound at all. In fact they had been elsewhere with the proposition, to two others, before submitting to Moffett the so-called confidential information in the Redeventza letter. They knew at least by June 1934 that defendant was not interested. No sale by defendant or any subsidiary was made to Redeventza until September 5, 1935. In fact plaintiffs did not, after May 1934, bother inquiring from defendant as to what, if anything, came of their information, transmitted in January 1934, until their demand letter of May 5, 1936. What plaintiffs attempt to assert would be a unilateral contract, binding the defendant, if the facts really warranted such a claim, but the alleged arrangement had no bilateral features binding plaintiffs to anything. Although this alleged basis of a claim by plaintiffs against defendant is not the cause of action pleaded in the complaint, I have nevertheless considered it, because I believe that summary judgment on supporting affidavits should not be granted a defendant if the record discloses any basis for a claim in plaintiffs. A complaint may be amended at a trial to conform to the evidence. Rule 15(b), F. R. C. P.

According to the complaint, plaintiffs' services were rendered between "about January 18, 1934 and about June 1, 1934". The bill of particulars shows the alleged services were rendered between January 18, 1934, the date of Veatch's first letter and May 8, 1934, the date of Veatch's cablegram to Moffett. Those are the date limits set forth in the affidavit and deposition of Hanover and Veatch. Having in mind the allegations of paragraph 2 of the complaint, plaintiffs' own statements show that plaintiffs were never requested by defendant to render any services, that they did not in fact render any services, that they did not procure a purchaser for the petroleum or petroleum products of defendant or any subsidiary of defendant, and that defendant did not agree to pay plaintiffs anything at all. Nothing in defendant's affidavits and exhibits adds any substance to plaintiffs' case.

Plaintiffs contend that there are the following issues of fact presented "(a) the value and character of the information given and whether same was given under circumstances of assent to payment or not, and (b) the position of the plaintiffs as the procuring cause of the final transaction". Considering (b) first, it is apparent from the above that there is no genuine issue of a material fact as to any allegation of paragraph 2 of plaintiffs' complaint. Plaintiffs' own statements and records show that there is no real basis for any of the allegations of paragraph 2 of the complaint, and that the complaint should accordingly be dismissed.

If there was no hiring of Veatch or Hanover as brokers, if there was no contractual relationship express or implied, there can be no recovery of commissions. Brady v. American Machine & Foundry Co., 86 App. Div. 267, 83 N.Y.S. 663; Barrett v. Lang, 243 App.Div. 35, 276 N.Y.S. 297, 302, affirmed 269 N.Y. 511, 199 N.E. 512. In the opinion filed by the Appellate Division in the Barrett case, supra, there appears a quotation from Pierce v. Thomas, 4 E. D. Smith, N. Y., 354, which is appropriate to the present case, "An owner cannot be enticed into a liability for commissions against his will. A mere volunteer without authority is not entitled to commissions * * *."

The most that plaintiffs can claim they did, was to endeavor to bring about a meeting between Sain and Moffett, which never took place. In that too, they were volunteers. Veatch's last cable was May 8, 1934. The first sale of crude oil by Bahrein Ltd. to Belgian Redeventza was September 5, 1935, almost 16 months later. Plaintiffs did nothing to effectuate that sale. They are not entitled to any commissions. Hamilton v. Gillender, 26 App.Div. 156, 49 N.Y.S. 663; Ellison v. Chappell, 181 App.Div. 263, 168 N.Y.S. 376, affirmed 230 N.Y. 626, 130 N.E. 920.

This is not a case where after a broker has brought the parties together on an arrangement for a sale, the parties then close the deal behind the broker's back in order

to cheat him out of commissions. Travis v. Bowron, 138 App.Div. 554, 123 N.Y.S. 290.

All that Veatch did towards bringing the parties together was to suggest to Moffett that it would be a "nice gesture" if he would arrange to see Sain. And Hanover on his part cabled Sain May 4, 1934, suggesting he get in touch with Moffett at London when Moffett would arrive there. That is not sufficient for a broker to earn a commission. Hamilton v. Gillender, supra; Walton v. McMorrow, 63 App.Div. 147, 71 N.Y.S. 250; Simonson v. First National Bank of Rockville Centre, 231 App.Div. 868, 246 N.Y.S. 497.

But plaintiffs claim that defendant availed itself of the fruits of plaintiffs' labors. As indicated above, plaintiffs' labors were light and their fruits nil. Assuming defendant did attempt to use plaintiffs' labors, however light, they produced no fruits and efforts to make a deal with Redeventza were abandoned by November 1934. Some 10 months later Green succeeded in selling Bahrein oil to Belgian Redeventza. That would not give rise to any implied promise to pay a commission to plaintiffs. Sibbald v. Bethlehem Iron Company, 83 N.Y. 378, 38 Am.Rep. 441; Simonson v. First National Bank of Rockville Centre, supra.

That plaintiffs had nothing to do with any sales of Bahrein oil to Belgian Redeventza, appears also from their total lack of knowledge on that subject. In their bill of particulars they state "Plaintiffs are without knowledge or information as to the dates or amounts of such sales". In the demand letter of March 3, 1936, they were equally indefinite. This suit is for $843,819.60, quite a large sum for commissions when the record discloses that the usual broker's commission was one cent a barrel. The total amount of Bahrein oil sold to Belgian Redeventza (and that was the only oil sold to any Redeventza company by the defendant or any of its subsidiaries) was 1,091,462 barrels, on which the total commissions would be $10,914.62. The total value of all the oil sold was slightly in excess of $500,000. One naturally wonders how plaintiffs figure their commissions at $843,819.60. Paragraph "C" of the bill of particulars gives the rather startling answer that it is figured on the total of Redeventza sales of petroleum and petroleum products for the years 1934 to 1937 inclusive, 2,109,549 tons. The bill of particulars then goes on to state: "Assuming that Redeventza purchased its entire requirements from the defendant, the commission at the rate of $\frac{1}{8}$ of 1¢ per gallon, which is approximately 40¢ per ton on 2,109,549 tons, would amount to $843,-819.60."

One should hesitate to assert a claim for so large a sum on any such manifestly unwarranted assumption. This also serves to show how thoroughly baseless plaintiffs' claim is.

In respect to plaintiffs' contention "(a) that there are issues of fact as to the value and character of the information given and whether same was given under circumstances of assent to payment or not", it appears from plaintiffs' own papers that plaintiffs volunteered the information. Defendant never requested or sought it. Admittedly there was no express promise to pay for it at any time. Nor can plaintiffs spell out any implied promise to pay for it, as hereinabove discussed. The situation here is not the disclosure, on an implied promise to pay therefor, of a novel plan or idea, or of literary material covered by a common law copyright. Moore v. Ford Motor Co., 2 Cir., 43 F.2d 685; Healey v. Macy & Co., Inc., 251 App.Div. 440, 297 N.Y.S. 165; affirmed 277 N.Y. 681, 14 N.E. 2d 388; Stone v. McCann-Ericson (S.D.N.Y. February 28, 1937, No. L 61-335),[1] cases which are cited in plaintiffs' briefs.

At the best Veatch's letter and its enclosure contained information as to a prospective purchaser for some of defendant's Bahrein crude oil. There was nothing confidential about the information plaintiffs transmitted in Veatch's letter of January 22, 1934. He stated in that letter that he had submitted the same information (Redeventza's letter of December 22, 1933) to two other oil men who had not shown any interest in it. As to how valuable it was, Veatch in the same letter said that he had another matter bearing on the European oil situation, "of much more importance" which he would like to discuss with Moffett. The particulars of that other matter Veatch did not state.

There is no genuine issue as to whether the information was given "under circumstances of assent to payment or not". True, Veatch stated in his letter that "Should it prove of interest and business

---

[1] No opinion for publication.

52

between yourselves and Redeventza result therefrom, I would expect from the business developed a reasonable return for myself to be shared with Mr. Hanover." But that did not place on defendant any obligation either to notify Veatch that defendant was not interested or to refrain from doing any business with Redeventza. Neither from silence on defendant's part nor from defendant's later business transactions with Belgian Redeventza can plaintiffs spell out any assent by defendant to pay plaintiffs for the information that Redeventza would be in the market in 1934 for gas oil products or crude oil.

Even if we assume that the information disclosed in Veatch's letter and its enclosure had a value, there was no agreement by defendant to pay for it "at the time of the conveying of said information", and plaintiffs accordingly cannot recover. Gellert v. Dick, 277 N.Y. 123, 13 N.E.2d 603, 604. Plaintiffs did not hold back their information until an agreement to pay a commission was made. Even a promise to pay commissions made after the disclosure of the name of a prospective customer has been held to lack the present consideration necessary to make it enforceable. Psaki v. Kissel Motor Car Co., 174 App.Div. 36, 160 N.Y.S. 107.

Assuming the facts most favorable to plaintiffs, namely, that defendant's first knowledge of Redeventza's needs was disclosed to it by plaintiffs and that defendant started its negotiations as a result of this information, a legal obligation to pay plaintiffs cannot be imposed upon defendant because of a sale through a third party so long after and so utterly unconnected with plaintiffs' efforts. Sibbald v. Bethlehem Iron Company, supra.

For these reasons defendant's motion for a summary judgment must be granted. To allow plaintiffs to maintain an action based upon so tenuous a thread as that developed by these facts would be to violate the rules of law determining the extent and nature of the hazards to be anticipated by persons engaged in promotions of a commercial nature. Indeed if plaintiffs' theory prevailed, any one could assure himself a part of the profits of business enterprises by the process of merely writing letters to people concerning projects which it reasonably might be expected would be attempted anyway.

■ No genuine issue of any material fact is presented. Defendant's motion is

properly made under Rule 56(b), Federal Rules of Civil Procedure and should be granted. Banco de Espana v. Federal Reserve Bank, 2 Cir., 28 F.Supp. 958.

In view of this disposition of the motion for a summary judgment, it is not necessary to pass on defendant's motion to strike the affidavit filed by plaintiff Hanover. It may be indicated, however, that the affidavit is subject to criticism, being argumentative, rather than factual in nature, but to the extent that it does contain facts, it has been accepted and considered on this motion.

Submit order on notice.