Stephen H. KARELITZ,
Plaintiff, Appellant,

v.

DAMSON OIL CORPORATION,
Defendant, Appellee.

No. 86–1816.

United States Court of Appeals,
First Circuit.

Argued Feb. 3, 1987.

Decided June 5, 1987.

Arnold E. Cohen, with whom Malcolm D. Finks, Englander, Englander & Finks, P.C., James F. Meehan, and Meehan, Boyle & Cohen, Boston, Mass., were on brief, for plaintiff, appellant.

James S. Dittmar, with whom Richard R. Lavin and Widett, Slater & Goldman, P.C., Boston, Mass., were on brief, for defendant, appellee.

Before CAMPBELL, Chief Judge, BREYER and SELYA, Circuit Judges.

BREYER, Circuit Judge.

The plaintiff-appellant in this diversity case, Stephen Karelitz, a stockbroker, has sued the defendant-appellee, Damson Oil Corp., for a finder's fee that, he says, Damson Oil owes him because 1) Karelitz introduced Barrie Damson, the President of Damson Oil, to officials of Buttes Gas and Oil Co. in 1973, and 2) nine years later Damson Oil bought an important oil and gas property from Buttes. The basis for Karelitz's claim is a written contract, signed by the parties in 1973, that says that Damson Oil will pay Karelitz a commission should the company acquire from Buttes the property in question (called Juniper Oil Corp.). This contract, if read literally, seems to entitle Karelitz to his commission, for the contract says nothing about time. Rather, it simply says that "Karelitz will be entitled to a 3% fee" should Damson "conclude with Buttes Oil" an "acquisition ... or like transaction" involving Juniper. The parties agree, however, that they intended the contract to be a typical 'finder's fee' contract, governed

by New York law. Karelitz concedes that for a finder to recover under such a contract "there must be a causal relation between the introduction of the parties and the ultimate conclusion of the transaction." Brief for Appellant at 13; *see Simon v. Electrospace Corp.*, 28 N.Y.2d 136, 320 N.Y.S.2d 225, 269 N.E.2d 21 (1971); *Seckendorff v. Halsey, Stuart & Co.*, 234 App. Div. 61, 254 N.Y.S. 250 (1931), *rev'd. in part on other grounds*, 259 N.Y. 353, 182 N.E. 14 (1932). The sole issue on this appeal is whether a jury might reasonably have found the necessary causal connection.

At trial, the jury gave a verdict in Karelitz's favor, thus implicitly finding for Karelitz on the causation question. The district court, however, set the verdict aside and granted judgment n.o.v. for Damson Oil. 640 F.Supp. 131. Karelitz now appeals. In our view, the district court was correct. No reasonable juror could have found the legally necessary causal relation between Karelitz's original introduction of the parties and the transaction that eventually took place.

## I

We take the facts as those shown by the plaintiff's evidence and by at least such of defendant's uncontradicted and unimpeached evidence as, under all the circumstances, the jury virtually must have believed. *See Dehydrating Process Co. v. A.O. Smith Corp.*, 292 F.2d 653, 656 n. 6 (1st Cir.), *cert. denied*, 368 U.S. 931, 82 S.Ct. 368, 7 L.Ed.2d 194 (1961); 9 C. Wright & A. Miller, Federal Practice and Procedure § 2529 (1971); Cooper, Directions for Directed Verdicts, 55 Minn.L.Rev. 903, 928–55 (1971). The more important of these facts include the following:

1) Karelitz and Damson met in 1971. Karelitz became Damson's personal stockbroker, and they had an extensive, longlasting business relationship.

2) In early 1973, Karelitz suggested to Damson that his company might want to buy the interest that Buttes Gas and Oil owned in Juniper Oil Corp. Damson agreed.

3) Karelitz then arranged a meeting, held on April 12, 1973, involving Karelitz, Damson, the President of Juniper (Sigmund Rosenfeld), and a friend of the President of Buttes (Louis Carnesale). Immediately after the meeting, Damson told Karelitz that he was "getting some facts and figures together," that Karelitz had done his job, and that he would be in touch with Karelitz later if he needed him. He and Karelitz also signed the written contract, which affirmed "that Stephen H. Karelitz introduced us to Juniper Oil Corp."

4) During the next two or three months, Carnesale and Rosenfeld discussed the possible sale of Juniper to Damson Oil, Juniper provided Damson Oil with engineering data, and Damson and Carnesale discussed the matter with John Boreta, the President of Buttes. The sale, however, did not take place.

5) The next relevant event took place nearly four years later, in April 1977, when Carnesale (not Karelitz) arranged a meeting (at Damson's request) between Damson and Boreta to discuss the sale of Juniper. Boreta did not sell Juniper, but he did later sell Damson Oil a drilling barge. Eventually, Damson Oil paid finder's fees to both Karelitz and Carnesale as a result of the barge sale. At that time (late 1977), when Karelitz protested that the barge fee was too small, Damson told him, "Your big money is going to be when we get the Juniper deal closed."

6) About two years later, in October 1979, Boreta (the President of Buttes) decided to see whether he could sell Juniper. He (or his company) compiled a list of twenty possible buyers; he sent eight of them confidential information about Juniper. He did not include Damson on either list.

7) Damson heard about Boreta's efforts to sell Juniper from one of the companies on the list of eight. A Damson Oil official asked Buttes to send him the confidential information. In February, 1980, Damson Oil returned the information to Buttes and indicated that it did not want to buy Juni-

per. Evidently no one else did either, for no sale took place.

8) In May 1981, a third party (not Karelitz) brought Damson and Boreta together again to discuss Juniper. This time the talks proved fruitful. On March 31, 1982, Boreta sold Buttes' interest in Juniper to Damson Oil. The next day, when the news became public, Damson called Karelitz and asked Karelitz to congratulate him. Karelitz did so; he also asked for his three percent commission. Damson refused to pay.

In addition to these chronological facts, Karelitz testified that he maintained his business relation with Damson (as his stockbroker) throughout the 1973–1981 period, that from time to time he "nudged" Damson about Juniper, and that in 1980 Damson said to him, "We got [Boreta] right where we want him.... Stay cool." Karelitz does not dispute the additional facts that the oil market changed dramatically between 1973 and 1981, that Juniper's production grew during this period from 600 to 2000 barrels per day, and that Juniper's revenue grew from about $1 million to about $23 million per year, with its stock price rising accordingly.

## II

These facts, in our view, demonstrate that Karelitz's initial introduction, while possibly a necessary condition of the eventual acquisition, was not a "cause." Here, as elsewhere in the law, a "cause" is more than simply a necessary "but-for" condition. A's negligence, for example, may be a necessary condition of B's injury—A may have driven his car too fast, thereby bringing his passenger B to a place where he is independently injured by a different car (or by a falling flower pot)—but the law of torts does not allow B to recover from A simply by showing the presence of "but-for" causality. *See generally* W. Keeton, Prosser and Keeton on Torts § 43 (5th ed. 1984) (discussing liability for "unforeseeable consequences"); *id.* § 44, at 316–19 (discussing liability for "foreseeable results of unforeseeable causes"). Similarly, here, the New York courts have insisted that the finder show more than that his service was a necessary condition. Rather, the finder must show that "the deal that was made resulted and flowed directly from the original" introduction. *Seckendorff v. Halsey, Stuart & Co.*, 254 N.Y.S. at 260. He must establish a "continuing connection" between the finder's service and the ultimate transaction. *Simon v. Electrospace Corp.*, 320 N.Y.S.2d at 229, 269 N.E.2d at 24. The case law has been summarized as follows:

> Although "procuring cause" is a principle sometimes said to apply with respect to a finder, it is clear that a finder's fee is not dependent upon the finder's participation in negotiations, and that it may become payable even though a third person brings the parties to agreement. If a finder introduces two parties for the purpose of merger, negotiations ensue from this introduction, they proceed without a break, and a merger results, the causation requirement is probably satisfied. If a finder introduces A to B for the purpose of effectuating a sale of A's property to B, and instead, B subsequently agrees to sell property owned by him to A, the causation requirement is probably not satisfied. If a finder introduces a prospective buyer and seller who enter upon merger negotiations that are abandoned and later resumed, the causation requirement is probably satisfied if the renewed negotiations stem from the original introduction, but not if an unrelated person reintroduces the parties and the deal results from this effectively new introduction. Courts have treated a lapse of considerable time as indicative of a break in the chain of causation.

13B B. Fox & E. Fox, Corporate Acquisitions and Mergers § 30.04(3) (1986) (citations omitted).

In this case, three factors, taken together, convince us that the plaintiff could not demonstrate, as the law requires, that the eventual acquisition "flowed directly from the original" introduction. First, eight years elapsed from the time of the introduction until the beginning of the successful negotiations. During that eight-year period, one can find, at most, a single re-

newed effort to negotiate, a sale of a barge, an occasional "nudge," and one or two ambiguous statements by Damson to Karelitz. Although passage of time alone does not automatically negate a causal connection, it is important. As time passes, the ever greater likelihood of new relevant events makes it ever more reasonable to relegate the original introduction to the status of 'background fact' and ever less reasonable to give that introduction the more elevated status of 'cause.' *See George E. Westberg Co. v. Quaker Oats Co.,* 311 F.2d 25 (2d Cir.1962) (citing passage of two and one-half years between suggestion of potential purchaser and conclusion of deal as reason for barring recovery); *Veatch v. Standard Oil Co.,* 49 F.Supp. 45, 51–52 (S.D.N.Y. 1940) (citing lapse of ten months), *aff'd without opinion,* 134 F.2d 173 (2nd Cir.1943); *but cf. Seckendorff v. Halsey, Stuart & Co.,* 254 N.Y.S. at 261 (holding that jury could find, despite one-year lapse in negotiations, that transaction occurred "within a reasonable time after" finder's services).

Second, the relevant circumstances changed rather dramatically during the eight-year period. Juniper acquired new property, its production grew, its revenues mushroomed, and the oil market underwent drastic changes. These facts suggest specifically what the passage of time suggests in general: that there was no continuity of negotiations—that the successful negotiations of 1981 bore no direct relationship to those of 1973 or 1977. *See Brown v. Snyder,* 57 App.Div. 413, 68 N.Y.S. 224, 226 (1901) (citing purchased concern's substantial additional investment during period after finder's activity as reason for barring recovery); *Lirtzman v. Fuqua Industries,* 677 F.2d 548, 555 (7th Cir.1982) (citing writedown of seller's assets and changes in governmental regulations to similar effect).

Third, there is uncontradicted evidence that Buttes' eventual interest in the successful sale had nothing to do with the original introduction. Buttes did not include Damson on its list of twenty potential buyers. The intervention of third parties (not Karelitz) brought Buttes' 1979 efforts to Damson's attention, and then brought Boreta and Damson together again in 1981. These facts significantly strengthen the inference that neither the 1973 negotiation nor the 1977 negotiation had much to do with the final sale. *See Lirtzman,* 677 F.2d at 554–55 (denying recovery where seller's interest in deal arose from independent causes long after initial meeting arranged by finder).

This case might be more difficult were only one of these factors present, but given the presence of all three factors, we do not see how a reasonable jury could find the necessary causal link. The precedent that plaintiff cites is not directly in point. *See Simon v. Electrospace Corp.,* 320 N.Y.S.2d at 227–230, 269 N.E.2d at 22–24 (affirming finding of causation where, after 18 months, parties resumed negotiations without intervention of a third party and with no indication that either party ever lost interest); *Seckendorff v. Halsey, Stuart & Co.,* 254 N.Y.S. 250 (affirming finding that finder had caused financer's interest despite one-year lapse in financer's negotiations with seller, during which new purchaser entered the scene); *Schaller v. Litton Industries,* 307 F.Supp. 126, 132 (E.D. Wis.1969) (finding causation where two years elapsed between original introduction and beginning of successful negotiations; court found strong evidence that finder had interested buyer, assumed without discussion that finder had interested seller, and held that acquisition took place "as a result of such interest"); *see also Bushkin Associates v. Raytheon Co.,* 815 F.2d 142, 151–152 (1st Cir.1987) (holding lapse of eighteen months and intervening suggestion by third party insufficient on motion for summary judgment to establish lack of causal connection). Rather, the facts here are closer to those in *Sternberg v. Bellanca Aircraft Corp.,* 259 App.Div. 538, 19 N.Y.S.2d 820 (1940) and *Lirtzman v. Fuqua Industries,* 677 F.2d 548, where the courts determined, as a matter of law, that the necessary causal connection did not exist. *See Sternberg* (lapse of two years during which company's circumstances changed materially and at the end of which new negotiations began through another inter-

mediary); *Lirtzman* (lapse of three years during which background circumstances changed substantially).

In sum, given the evidence as to elapsed time, changed circumstances, and independently developed seller's interest, we do not believe that a reasonable jury could find more than a naked, "but-for" connection. Indeed, the New York courts have warned against "forever barr[ing]" a client from dealing with a firm to which a finder has introduced it "without paying ... a commission on any agreement reached at any time in the future with that firm through any other intermediary." *Sternberg*, 19 N.Y.S.2d at 823. To permit a jury to find "cause" here would risk that very result.

The judgment of the district court is

*Affirmed.*