# Helmig, Appellant, *v.* Rockwell Manufacturing Company.

Argued October 8, 1954. Before STERN, C. J., STEARNE, CHIDSEY, MUSMANNO and ARNOLD, JJ.

*Frank R. Bolte,* with him *Francis S. McMichael,* for appellant.

*J. Wray Connolly,* with him *W. S. Moorhead, Jr., John M. Feeney, Jr.,* and *Moorhead & Knox,* for appellee.

OPINION BY MR. JUSTICE CHIDSEY, January 3, 1955:

This action in assumpsit was brought by the plaintiff, C. S. Helmig, a steel broker, against the defendant, Rockwell Manufacturing Company, a corporation, to recover a broker's commission. The jury returned a verdict in favor of the plaintiff in the sum of $177,·

811.20. The defendant filed motions for judgment non obstante veredicto and a new trial. The court en banc, deeming the evidence insufficient to impose liability on the defendant, granted defendant's motion for judgment n.o.v. and accordingly refused the motion for new trial. From the judgment thereupon entered for the defendant plaintiff has taken the present appeal.

In the spring of 1948 the defendant was engaged in the manufacture and sale of various finished steel products. At that time defendant's demand for the use of steel sheets far exceeded its supply. Having no facilities at its own plant for the production of these sheets and the customary channels of trade being unable to furnish defendant's requirements, it was forced to resort to other means of supply. On or about April 2, 1948 the plaintiff informed W. H. Newbaker, defendant's vice-president in charge of purchases, that he knew of one method of acquiring additional rolled steel. He represented to defendant's agent that there was a possibility he could obtain a sufficient quantity of acceptable steel ingots and then have the owner of a rolling mill process and convert the ingots into rolled sheets. As a result of these negotiations the defendant on April 7, 1948 sent the following letter to the plaintiff: "Gentlemen: In consideration for services rendered in procuring 6,000 gross tons of acceptable steel ingots and the yield from the rolling time necessary for the conversion of same into hot rolled, pickled and oil sheets, we agree to pay to C. S. Helmig a commission of $35.00 per net ton on delivery payable upon presentation and/or our receipt of shipping documents for all sheet accepted at destination designated by us. This commission based on $215.00 per net ton of sheets F. O. B. eastern seaboard. This letter is preliminary to the establishment of an irrevocable letter of credit, said letter of credit to be established in a Pittsburgh

bank mutually agreeable on the terms indicated above.".

Upon receipt of this letter plaintiff contacted an associate, one Graydon Thomas of Baltimore, Maryland, in reference to securing rolling time at a mill. Thomas had previously advised the plaintiff that there was available rolling time at the Sparrows Point Mill of the Bethlehem Steel Corporation. Thomas arranged a meeting between the plaintiff and a Mr. Husted, manager of the Baltimore sales office of Bethlehem Steel Corporation, regarding this matter. At the meeting Mr. Husted informed plaintiff and his associate that he was not in a position to discuss the possibility of a conversion arrangement for a customer of the Pittsburgh office and, therefore, referred them to Bethlehem's Pittsburgh representative, Charles H. Cecil. Subsequently Thomas and Newbaker had a meeting with Mr. Cecil in Pittsburgh, at which time they discussed the defendant's requirements. Cecil advised them that he would communicate with the home office and let Mr. Newbaker know what could be done to procure the necessary rolling time. Plaintiff had available 6,000 gross tons of ingots which could be supplied by the Brown Steel Products Company upon specifications satisfactory to the defendant. The day after the meeting with Cecil defendant sent the following letter of cancellation to the plaintiff: "Dear Sir: After contact and discussion with the mill representative to whom you referred us regarding the conversion of steel ingots into hot rolled, pickled and oiled sheets, the mill representative has advised us that they are not interested in any arrangement of this kind. Inasmuch as this conversion of the ingot cannot be consummated with the mill, we are withdrawing and cancelling the arrangement as outlined and stated in our letter of April 7, 1948 to you. Thanking you for your

interest, we are . . .". A short time thereafter the defendant company was able to procure a comparatively small portion of its requirements by obtaining some steel slabs from A. M. Byers Company without the intervention of a middleman, and these were converted into 359.7 tons of steel sheets by Bethlehem Steel Corporation under an agreement dated May 5, 1948.[1]

Plaintiff's sole contention is that the court below erred in entering judgment for the defendant because the evidence was sufficient to permit the jury to infer that bad faith existed in the withdrawal of its offer. Defendant, on the other hand, denies any bad faith and asserts that through no fault on its part plaintiff did not and could not perform the conditions upon which its offer of compensation was predicated, and therefore it was justified in terminating the employment.

The terms of employment form the foundation of the principal and agent relationship. In the present case the rights and obligations of the parties are governed by the letter of April 7, 1948, written by the defendant to the plaintiff for the express purpose of defining the terms of the arrangement respecting the payment of the commission. It provided that a commission was payable if the plaintiff procured (1) 6,000 gross tons of acceptable ingots and (2) the rolling time necessary to convert the ingots into sheets. It is ap-

---

[1] Plaintiff estimated that the stipulated 6,000 tons of ingots would yield 4,704 tons of steel sheets which, at the commission rate of $35 per ton, would entitle him to $164,640 which with interest was the amount awarded to him by the jury. For the reasons hereinafter stated, we hold that plaintiff was not entitled to any recovery. But even if he were, it is extremely questionable under the pleadings and the evidence that his damages could exceed the sum of $12,589.50, the commission at $35 per ton on the 359.7 tons of steel sheets which defendant received from Bethlehem as the result of conversion of the Byers slabs.

parent that the parties contemplated a completed transaction for the essential subject matter was steel sheets, not ingots. That the parties themselves so construed the arrangement is evidenced by the plaintiff's own testimony on cross-examination: "Q. . . . I believe you have previously stated, that Rockwell was interested only in sheets. A. That's right. Q. Not in ingots? A. That's right. Q. So that you have not completed your transaction until you have taken the ingots and actually put them through the mill and brought them back as sheets; is that correct? A. That is correct.".

Plaintiff's evidence discloses that up to the time when he received the letter from the defendant cancelling his agency, he could have procured the ingots but he had received no definite assurance from Bethlehem that it would allow him rolling time to convert the ingots into steel sheets. Defendant in its letter terminating plaintiff's services stated that its reason for such action was Bethlehem's disinterest "in any arrangement of this kind". The plaintiff testified that upon receipt of this letter he telephoned Mr. Newbaker of the defendant company and was informed by him that " . . . the deal had been turned down because it was not of interest to Bethlehem Steel Corporation as it was assigned to them; that is, that they were not interested in having another party particularly interested in the proposition.". The undisputed testimony established the fact that Bethlehem refused to convert the Brown Company's ingots because of a company policy against conversion arrangements where middlemen were involved. Bethlehem's refusal to enter into the transaction because of the participation by an intermediary rendered it impossible for the plaintiff to perform his bargain for admittedly he had no other source of ingots or rolling time available. Negotiations having reached an impasse, defendant was forced

to look elsewhere for its requirements and was able to partially satisfy its demands by procuring steel slabs directly from the Byers Company without the aid of a middleman. When Bethlehem learned that the defendant had in contemplation the securing of slabs from this new source, it reiterated its policy in a letter to defendant which read in part: "Our offer to convert is contingent on the slabs being procured direct from Byers without brokers or middlemen.".

It is incumbent upon a broker to prove either that a sale was made to the party whom he procured as a purchaser or that the purchaser was ready, able and willing to buy and the failure to make an actual sale was through no fault of the broker or his customer: *Kifer v. Yoder*, 198 Pa. 308, 47 A. 974; *Speer v. Benedum-Trees Oil Company*, 239 Pa. 180, 86 A. 695. Assuming arguendo that plaintiff brought Bethlehem and defendant together, that was but one step in the transaction, for as previously indicated, without rolling time the ingots were absolutely worthless to the defendant. The mere fact that negotiations are begun by a broker with a purchaser, who ultimately buys directly from the owner, does not entitle the broker to remuneration unless his prior acts are the efficient procuring cause of the sale: *Bossart v. Erie Coal Mining Co.*, 276 Pa. 63, 119 A. 731. Here the agent's compensation was dependent upon the accomplishment of a specified result. Unless the principal revokes the offer in bad faith, an agent whose compensation is dependent upon the accomplishment of a specified result is not entitled to compensation for services rendered in an unsuccessful effort to accomplish that result, although the principal is thereby benefited, if the services are not part of the bargained for exchange. See Restatement, Agency, §§453, 454. Plaintiff's proof fell far short of showing bad faith by the defendant. There was

not a scintilla of evidence to justify a finding by the jury that the defendant prevented performance by the plaintiff or that it in any way induced Bethlehem to withdraw from the transaction. On the contrary the evidence clearly established that the break in the chain of causation was absolutely beyond the defendant's control. Plaintiff could not perform his undertaking because under no circumstances would Bethlehem, plaintiff's "customer", consummate the transaction because an intermediary was involved.[2] The right to a commission ended when Bethlehem refused to contract, for the plaintiff's reward was to be measured solely by his success in accomplishing the specified result. The risk of failure and the realization that no commission would accrue for the time and labor expended in fruitless efforts to procure the steel sheets was inherent in plaintiff's terms of employment.

Judgment affirmed.

---

[2] No inquiry was made as to the reasons for Bethlehem's policy, although they may be surmised. It was sufficient that such policy unquestionably existed and was not controverted. Obviously but for such policy Bethlehem would have earned and therefore benefited far more from the production of 4,704 tons of steel sheets than from the production of only 359.7 tons.