Breitel, J.
Plaintiff, a finder of business opportunities, has recovered judgment against defendant for commissions, including interest and costs, for $920,967,25. Following a full trial, two limited issue trials, and two appeals to the Appellate Division, defendant appeals directly from the described final judgment rendered in the trial court, thus bringing up for review only the questions determined by the two intermediate orders of the Appellate Division (CPLR 5501, subd. [b]; 5601, subd. [d]). The orders, however, embrace the two principal issues in the case, liability and measure of damages.
The issue of liability is whether plaintiff earned a commission by reason of the corporate merger two and a half years after he was retained by defendant’s predecessor under a written agreement. Defendant contends that the retainer was abandoned, that the merger was not the kind embraced by the retainer, and, in any event, plaintiff was not responsible for the transaction. If there was evidence to support the findings of fact in plaintiff’s favor affirmed by the Appellate Division, albeit by a divided court, there may be no further review of the facts, but only of the legal issues raised. Since the findings are supported and no rules of law were applied improperly, the issue of liability must be resolved in favor of plaintiff. As to damages, that is another matter. The quantum of recovery is egregiously out of line under rules determining damages in breach of contract. Consequently, there must be a redetermination of damages, but on a formula, the elements of which are supplied by the record, thus requiring no more than a simple arithmetic computation.
Critical to liability are the subordinate issues; namely, whether the merger of two corporations was within the scope of the retainer, and whether plaintiff was responsible for the merger within the terms of the retainer.
On October 14, 1964 plaintiff received the following letter agreement of retainer from Mr. Brown, then president of Electrospace Corporation, the corporation eventually merged into defendant which bears the same name:
“ This will confirm our conversations, regarding Electrospace Corporation.
“ In the event a sale of stock, or all the assets, or a merger is arranged by you with a corporation, company, or individuals *140 introduced by you on terms approved by the stockholders of Electrospace Corporation, a fee of 5% of the gross value of the transaction will be paid as a commission at the time of closing, in cash or stock of the company purchasing.
‘ ‘ This is a non-exclusive arrangement, and, in the event we do sell or merge to other parties not introduced by you, no compensation is earned due or payable. This commission is not earned due or payable until and unless title to the assets or stock is actually transferred to the purchaser or the merger is legally consummated.”
In the period following, until Brown left Electro space, plaintiff, directly or indirectly through associates, arranged meetings with several prospects, including a Mr. Taxin, principal of a corporation holding a substantial interest in its affiliate, Bobosonics, the eventual partner in merger with Electrospace. The object of these meetings was largely to bring about the purchase of the assets or corporate stock of Electrospace. By September, 1965, when Brown left Electrospace, nothing had come of these meetings. Thereafter, until the very early part of 1967, plaintiff or associates of his continued to present prospects to Brown’s successor, Wolf, or at least so plaintiff’s witnesses testified. Defendant’s witnesses either denied or minimized the later efforts. From the early part of 1967 until the merger in June, 1967, plaintiff and his associates testified that they were kept in the dark about negotiations between Bobosonics and Electrospace, and their inquiries were averted.
What had happened in the meantime is that somehow Taxin, the man interested in Bobosonics, and Wolf of Electrospace, had gotten together on a merger scheme between the two corporations, each of which lacked sufficient working capital either to continue as it was or to purchase the other. The catalyst for the scheme was a proposed underwriting by a firm headed by one Federman, originally for $1.5 million, but later $2.5 million, of convertible debentures to be sold to the public on behalf of the surviving corporation. It was first planned to merge Bobosonics, the smaller corporation, into Electrospace. The plan was changed when it was realized that Bobosonics had a valuable “ asset ” preservable only if it were the surviving corporation, namely, a considerable tax loss which could be carried forward to offset future profits in the payment of income *141 taxes. Instead, Electrospace was merged into Robosonics, and the name of Robosonics was changed to Electrospace. While the principals in both corporations remained with the surviving corporation, there is no question that the Electrospace people became the dominant figures. Stock in the merged corporation was issued in exchange to the stockholders of the constituent corporations by formula, utilizing in the case of Electro space four new shares for one of the old.
Sharply contested on the first and full trial and still argued vigorously is whether the merger was within the scope of. the retainer. Defendant argues that the retainer contemplated only a sale of Electrospace to another, not the reverse, or any substitute for a sale. Plaintiff argues that the retainer contemplated “ any kind of a deal ” which would bring about a viable enterprise, with or without financing, or an outright disposition by sale. It suffices that, despite contradiction, there was testimony to support plaintiff’s view, and both the trial court and the Appellate Division found in favor of plaintiff (32 A D 2d 62). What had been contemplated as the future transaction was certainly a question of fact. The letter agreement, referring to “ a sale * * * or a merger ’ ’, does not resolve the issue in favor of defendant. This is so, even if the additional language describing the commission to be payable in cash or stock of the company purchasing ” is weighed.
In any event, as concluded by the trial court and the Appellate Division, on the first appeal to that court, the change in the “ set-up ” for the final transaction would not alone preclude recovery of a commission (32 A D 2d 62). As stated by Mr. Justice (Teller, in his opinion following the trial:
“ The fact that a ‘ different ’ set-up from that originally discussed at the initial meetings finally eventuated is ‘ a matter of no materiality whatever ’ (Seckendorff v. Halsey, Stuart & Co. Incorporated, 234 App. Div. 61, 70, reversed on other grounds 259 N. Y. 353). In Seckendorff plaintiff was merely a finder, in nowise a broker. Here plaintiff was not called upon by defendant to carry on negotiations either in the 1965 or 1967 meetings. In both situations the plaintiffs had nothing to do with the nature or form of the deal and their right to recovery could not be made dependent on the form the transaction ultimately took.
*142 ‘1 In Sechendorff the Court of Appeals stated (p. 357): 1 Tracing a connection between plaintiff’s introduction of the business and the termination of the entire transaction was for the jury’s consideration * * * .’ There was a time lapse of almost two years between those events. Here there was a time lapse of about eighteen months between the first Eobosonics meeting and the reactivation of the deal by Taxin’s call to the new president. Tracing a connection between the two is supported by the facts and the reasonable inferences to be drawn therefrom and is not to be rejected because of the intervening lapse of time.”
Enough has been stated to indicate that the evidence, albeit contradicted, also sufficed to establish a continuing connection between plaintiff’s initial efforts and the merger that came about. The issue, therefore, on this score, is beyond review in this court (CPLE 5501, subd. [b]; Cohen and Karger, Powers of the New York Court of Appeals, pp. 447-455).
Given these facts, plaintiff’s failure to “ arrange ” the deal, as prescribed in the retainer agreement, and even giving full value to defendant’s argument that plaintiff before earning his commission would have been bound to be midwife for the consummated transaction, his failure is excused. On defendant's" version as well as plaintiff’s no one was permitting plaintiff to nose into the Eobosonics-Electrospace negotiations in 1967. The trial court so found and the Appellate Division affirmed.
The rule is well-established in brokerage cases, and is analogous here, that interference with the opportunity of a broker to complete his services does not bar his right to commissions (e.g., Sibbald v. Bethlehem Iron Co., 83 N. Y. 378, 383-384 ; 6 N. Y. Jur., Brokers, § 128). The rule is but a species of the more general doctrine that a promisor is not discharged by the nonperformance of a condition precedent or return promise imposed on the promisee but which the promisor prevented or hindered (Sibbald v. Bethlehem Iron Co., supra, p. 384; Eestatement, Contracts, § 295).
Consequently, plaintiff is entitled to recover a commission. How that commission is to be measured occasions difficulty only because untraditional measures were applied by the trial court and the Appellate Division. Notably, the trial court which heard the limited issue on remand, and an unspecified majority of the Appellate Division on the second appeal, were of the view that *143 the measure of damages directed on the first appeal was improper. Only the constraint of a higher court’s determination in the one instance, and the law of the case in the other, prevented a reassessment of damages on a different basis (34 A B 2d 528).
The trial court, on the full trial, was influenced by the significant “catalytic ” effect of the infusion of new money by convertible debenture financing. It held, therefore, that plaintiff was not entitled to the extra value thus contributed to the transaction. It stated as much, in seeking to apply the commission clause in the retainer agreement, namely, “ 5% of the gross value of the transaction ” payable in cash or stock.
The trial court erred on two counts. In the first place, to borrow $2.5 million is still to owe $2.5 million. Both sides of the balance sheet are identically affected. Whether the debt will increase or decrease the “public prospects ” of the borrower, and, therefore, the value of its shares, depends on the purpose of the borrower and the success or failure anticipated from its activities. Moreover, the very convertibility of the debentures, by itself alone, would have a “ diluting ” effect on the common shares. This brings one back to the intrinsic value of the merger, that is, the potential added to the constituents if merged. If there were no added potential there would be no merger or there should be none. Moreover, it is accidental, in a legal sense, whether the needed money is already earned and in the coffers of one of the constituent corporations, whether it has been borrowed before any merger had been contemplated, whether it has been borrowed by one or both of the corporations in contemplation of the merger, or whether it is borrowed by the merged corporation. On the second count, after the merger the new shares (issued 4 for 1 to Electrospace shareholders) were selling for $10 per share. There was no change at that time, according to the only proof on that issue, in the value of the new shares, after adjustment, because of the merger or the prospective underwriting, a published part of the merger plan. That time was also the breach date, as recognized by the trial court.
As a consequence of its view, however, that plaintiff should not benefit from the new financing, the trial court awarded plaintiff as damages 5% of the value of the net assets of Electrospace, as if the assets had been sold at book value to the merged corporation. Plaintiff was given judgment, therefore, for 5% of *144 the net worth of Electrospace, that is, 5% of $1,264,785 or $63,239.25. Obviously, this is not 5% of the gross value of the transaction prescribed by the retainer, and book value, notoriously, is an unreliable index for determining market value. Otherwise, a moribund, debt-free, but over-capitalized, white elephant, good for salvage and at the mercy of a market raider, would justify a higher price than a much sought-after, actively-growing, under-capitalized, aggressive enterprise of equal net worth. (Defendant urged that if it were liable, then the measure should be 5% of Robosonics ’ much smaller net worth, on the theory that the realities were that Electrospace acquired Robosonics, rather than the other way around. On this view plaintiff would receive $23,349.75.)
Apart from economic unsoundness in fixing the commission on the net worth of Electrospace, it has no legal support. It was not so provided in the agreement. It is not a measure in quantum meruit. It is not a measure of unjust enrichment. It is quite arbitrary and bears only a superficial plausibility to a “ rate ” of the assets to be sold; but the net worth is, as seen, not a measure or even the equivalent of the “ assets ” or stock ” sold or exchanged. It was perhaps an attractive formulation but not one upon which the parties had agreed should be the commission, or one which the law implies or imposes in the absence of express agreement or any agreement.
On the first appeal, the Appellate Division in affirming as to liability overturned the judgment as to damages (32 A D 2d 62). It applied the rule of Menzel v. List (24 N Y 2d 91), then just decided by this court. That case involved the conversion of a unique property, a Chagall painting, the return of which had been refused, and the value was fixed at the time of trial. Of course, as a replevin case which it was (id., at pp. 94, 96), until judgment was rendered, the owner had the continuing right to possession of the painting. What the possessor had to pay, in any event, was the value at trial date (or to return the painting), and the issue that remained was the amount owed by the seller as a third-party defendant to the third-party plaintiff possessor on the seller’s breach of warranty, an abstruse problem (id., pp. 95-97). Obviously, such a rule and such a case has no application to a common breach of contract resulting from the nondelivery, as promised, of stock of new Electrospace, *145 property not unique and available on a public market. In any event, the application of the replevin-breach of warranty-unique property rule, after two limited issue trials and one more appeal to the Appellate Division, resulted in the current judgment for almost $1 million, with the interest clock running all the time.
While just after the merger the new shares of Electrospace sold for $10 per share, it was to reach a high of $46 and during the trial its price averaged $34.75. To make matters worse, viewing plaintiff as if he were the owner of shares on the breach date, he was also given the value of a stock dividend on the shares he never owned, but which he would have, if defendant had performed, and he did not sell his shares. Hence, the magnitude of the recovery, that is 5%, or 25,605 shares of 512,100 shares distributed to Electrospace stockholders, plus a subsequent stock dividend, each share first valued at $34.75, but reduced to $29 to allow for restriction of resalability of the shares under Securities and Exchange Commission regulations.
The proper measure of damages for breach of contract is determined by the loss sustained or gain prevented at the time and place of breach (e.g., Parker v. Hoppe, 257 N. Y. 333, 341; Hoppe v. Russo-Asiatic Bank, 235 N. Y. 37, 39; 11 Williston, Contracts [3d ed.], § 1339; 25 C. J. S., Damages, § 74, at pp. 850-851; 13 N. Y. Jur., Damages, § 43; Be statement, Contracts, § 329, esp. Comment b; cf. § 338, incl. Comments). The rule is precisely the same when the breach of contract is nondelivery of shares of stock (Ann., Agreement to Pay Sum in- Securities, 34 A. L. R. 931; cf. Ann., Damages—Broker’s Contract — Time, 31 A. L. R. 1179). The exceptional instances in which restitution or specific performance are allowed are not applicable to this case (see, Restatement, Contracts, §§ 347 et. seq., 358 et seq.). Plaintiff was never the owner of the stock of Electrospace just because defendant breached its contract to deliver the shares. That breach and the loss caused was fixed and determined in 1967 from which time plaintiff’s cause of action accrued, and the Statute of Limitations started to run. That was, therefore, also the time when the value to him of defendant’s performance was to be measured. It was then that plaintiff was to be made whole and not at some future time never specified in the agreement. Electrospace shares were not unique and their *146 value, the record shows, was precisely determinable on the public market, namely, at $10 per share (Williston, op. cit., supra, § 1342). If plaintiff were anxious to own the shares rather than obtain their value, he was free to purchase them in the market. His cause of action should not and may not be converted into carrying a market “call” or “warrant” to acquire the stock on demand if the price rose above its value as reflected in his cause of action. Indeed, even in the conversion of shares of stock owned by a plaintiff there is only a reasonable time limit within which the owner may elect to fix his damages; he may not recover the highest interim or trial-time value (Hartford Acc. & Ind. Co. v. Walston & Co., 22 N Y 2d 672, 673; Mayer v. Monzo, 221 N. Y. 442, 446-447; Wright v. Bank of the Metropolis, 110 N. Y. 237, 249; Ann., Damages — Stockbroker’s Breach, 63 A. L. R. 305). On the other hand, plaintiff was protected against a decline in the value of the stock to which he was entitled to receive delivery in the summer of 1967.
On this view plaintiff, in accordance with the retainer agreement, was entitled to receive 5% of the gross value of the transaction in cash or stock of the company purchasing. Looking to the economic realities and eschewing legalisms or verbalisms, when these two companies merged it was immaterial, for this purpose, whether there was a new or a surviving constituent corporation. In either event, the new corporation or the old survivor, with restructured capitalization, acquired the two constituents. The agreement, indeed, provided for merger as an alternative, and, the stockholders of old Electrospace did receive, in fact, new shares in the “ new ” or “ surviving ” corporation. Hence, plaintiff was entitled to 25,605 shares or 5% of the 512,100 shares distributed at the time of merger to Electrospace stockholders, or their then value at $10 each.
Incidentally, if it were true that the commission clause gave an alternative to Electrospace to deliver either shares or cash, plaintiff would have to take that which gave him the less valuable alternative, in the event of breach (Restatement, Contracts, § 344). However, the courts below have found, and correctly if regarded as a question of law in the interpretation of the retainer agreement, that the payment clause was intended to provide for delivery of stock or cash, depending on what was *147 received from the purchasing company in the sale of the assets or stock, or merger, of Electrospace.
There is a subordinate question whether plaintiff was entitled to restricted stock or stock freely salable. If restricted, then the market value would have to be discounted in some way. The retainer agreement in the eventuality which arose, called for 5% of the stock received by Electrospace stockholders. That stock was not restricted. Hence, plaintiff is entitled to receive 5%. of the equivalent unrestricted stock received by Electrospace stockholders.
As for defendant’s argument that no more stock could have been distributed without restriction, under requirements of the Securities and Exchange Commission, it holds no water. In the first place, that was the obligation of defendant and its predecessor and if not performable in specie it must have been performed then or now in money value (damages). In the second place, defendant had no trouble in registering 4,000 unrestricted shares to be divided as a “ finder’s ” commission between Mr. Taxin and Mr. Federman. They took, these commissions, it is notable, in addition to the benefits the one received by introducing the smaller Robosonics into the merger, and the other received by his company’s underwriting fee for flotation of the convertible debentures of the merged corporation. What defendant did for Taxin (who was conspicuously unwilling to testify in this case, although he knew best who was responsible for initiating the Robosonics-Electrospace merger) and Federman, the engineer of the “ catalyst ” for the merger and Taxin’s friend, it should have done for plaintiff.
Accordingly, the judgment should be modified, with costs to defendant-appellant and the action remitted to Special Term to enter judgment in accordance with this opinion.
Chief Judge Fuld and Judges Scileppi, Bebgan, Jasen and Gibson concur; Judge Bueke taking no part.
Judgment accordingly.