Amerofina, Inc. *v.* U. S. Industries, Inc., Appellant.

Argued November 14, 1974. Before WATKINS, P. J., JACOBS, HOFFMAN, CERCONE, PRICE, VAN DER VOORT, and SPAETH, JJ.

*Gilbert J. Helwig,* with him *Eric P. Reif,* and *Reed, Smith, Shaw & McClay,* for appellant.

*William D. Sutton,* with him *Thorp, Reed & Armstrong,* for appellee.

OPINION BY JACOBS, J., February 27, 1975:

This case, evolving from a complex history of facts, represents a suit by Amerofina, Inc. [hereinafter Amero-

fina] against U. S. Industries, Inc. [hereinafter USI] to recover a "finder's fee" which Amerofina alleges is due it for services rendered under an oral contract. Amerofina alleges that USI agreed to compensate Amerofina for its assistance in locating and procuring acquisition candidates for USI's program of corporate growth and amalgamation.

USI does not deny the existence of the oral contract, but it asserts that under the terms of the contract Amerofina was required to do more than locate and introduce suitable acquisition candidates. USI asserts that Amerofina was required to act as a "broker", an engagement which required active negotiation on behalf of USI. USI also asserts that irrespective of the semantic characterization of Amerofina's contractual undertaking, it must prove as a condition precedent to recovery that it was the "efficient procuring cause" of the acquisition. The evidence produced, USI asserts, was insufficient to satisfy this burden.

The jury returned a verdict for Amerofina in the amount of $220,000. Post-trial motions were denied, and USI brings this appeal.

The factual background of this case is a difficult terrain to cross, but the journey is necessary for a proper resolution of the issues. During the time pertinent to this case USI was a large conglomerate composed of more than one hundred subsidiaries and divisions operating in various fields. Amerofina was engaged in the business of investment banking and stock brokerage, with principal offices in Pittsburgh, New York, Italy and Switzerland. In the summer of 1968 Herbert Kerr, a vice president of USI travelled to Pittsburgh to meet with Samuel Garvin, a vice president of Amerofina, who had been retained by a banking institution to find a purchaser for the bank. Kerr decided that the bank would not be a suitable acquisition for USI; however, he entered into an agreement with Garvin under which Amerofina would

find and present to USI suitable companies for acquisition. Garvin testified that Kerr asked Amerofina to represent USI "on a finder's fee basis," and that he accepted the offer.

Kerr acknowledged that the parties had discussed USI's interest in acquisitions, that he had furnished Garvin with certain acquisition criteria, and that he had agreed that USI would pay a "reasonable fee" or a "mutually agreeable fee" in connection with acquisitions made by USI.

The first acquisition made by USI pursuant to this contract was a group of five affiliated corporations known as Berkeley Schools. Garvin introduced the parties, supplied USI with financial information, and helped to persuade one of the principal shareholders of Berkeley not to pull out of the deal because of a delay on the part of USI. Amerofina was paid $85,000 by USI which the Berkeley-USI acquisition agreement characterized as being "for its services to USI as finder in connection with the negotiation of this Agreement." Plaintiff's Exhibit 6.

The second matter for which Amerofina received a fee from USI involved USI's acquisition of a group of west coast finance companies known as Universal Guardian Acceptance Corporations [hereinafter collectively referred to as Finance]. Finance had been organized by the principal shareholders of a group of "health spa" corporations which eventually were to become Health Industries, Inc. [hereinafter Health], a third USI acquisition which is the subject of the present lawsuit. Finance was organized to serve as a financing institution which would buy or discount membership contracts of the various health spas. In 1968 Raymond Wilson, a principal shareholder of Finance and owner of some 13 spas, asked his attorney to locate a company which would be interested in acquiring Finance and Wilson's spas. The attorney, Lederer, contacted a broker, Dresner, who contacted Amerofina. Dresner furnished Amerofina, at its request,

three folders of financial and other information, two relating to Finance and one relating to the spa corporations. After reviewing this information Amerofina, through Garvin, decided to submit the proposition as an acquisition possibility to USI. Kerr of USI was interested and Garvin made several trips to California in connection with the acquisition and on two of these trips he was accompanied by Kerr.

Meanwhile, and prior to Kerr's trips to the coast, Wilson, in search of expansion funds, had placed his spas into an inactive corporate shell traded on the Salt Lake City Stock Exchange, Kennebec Consolidated Mining Co. [hereinafter Kennebec] with thoughts toward a public offering. Another spa owner, Rice, who was also a Finance shareholder also transferred his spas into Kennebec, the name of which was later changed to Health.

Thus when Kerr and Garvin travelled to California in late 1968 and early 1969 Wilson was a major stockholder of both Finance and Kennebec. Garvin presented the interrelated Finance and Kennebec companies to USI as a two-step transaction, with USI first acquiring Finance which needed funds to continue purchasing the increasing amount of paper generated by Kennebec, and second with the possibility of USI acquiring the spas at a later time.

The Finance acquisition was formally closed in April of 1969. The Finance-USI acquisition agreement states: "USI warrants to the Shareholders that it has not employed any broker or finder in connection with this transaction other than Amerofina, Inc., and USI will pay the fee of such finder in accordance with its arrangements with it." Amerofina was paid $115,000 for its services in connection with the Finance acquisition.

It appears that the second step of the acquisition was delayed because of a rather substantial difference in the price-earnings ratio between the USI stock and Kennebec

stock. However, in June of 1969 after a public offering of Kennebec stock lost its attraction due to a general market decline Wilson instructed his attorney, Lederer, to make efforts to rekindle USI's interest in the acquisition. In response to a letter from Lederer, Kerr dispatched an assistant to Salt Lake City to explore further the possibility of acquisition. In October of 1969, an acquisition agreement was executed under which USI was to acquire the newly named Health for $46,000,000. At this time Kerr informed Garvin that USI could not pay a finder's fee to Amerofina because Wilson had demanded that the fee be paid to Lederer. When Garvin's demands that the fee be paid to Amerofina were rejected, Amerofina began this assumpsit action.

It is upon this factual background that the present issues must be resolved. As stated above, USI raises a two-pronged sufficiency of the evidence issue challenging first, that Amerofina failed to sustain its burden of proving that it was the "efficient procuring cause" of the Health acquisition; and second, that even if there was sufficient evidence of the causal link Amerofina's evidence was insufficient to show that USI had agreed to pay Amerofina for the type of limited nonparticipating services performed in this case. We will address ourselves first to USI's second contention.

I

Assuming for the moment the existence of the necessary causal relationship, it is USI's contention that Amerofina was engaged as a "broker" and not as a "finder." Such distinction as exists between these two terms is more a matter of trade usage than legal definition. In general, a finder is an independent actor whose role is that of a middleman who introduces the parties, supplies information to one or both about the other and is required to do little else, whereas a broker "negotiates on behalf of one of the parties or performs or is required

to perform some other act identified with the interests of one party and against the interests of the other." 13A Business Organizations, Fox & Fox, Corporate Acquisitions and Mergers, §30.02 (1974). "The finder is a person whose employment is limited to bringing the parties together so that they may negotiate their own contract, and the distinction between the finder and the broker frequently turns upon whether the intermediary has been invested with authority or duties beyond merely bringing the parties together, usually the authority to participate in negotiations." *Tyrone v. Kelley,* 9 Cal. 3d 1, 9, 507 P.2d 65, 70, 106 Cal. Rptr. 761, 766 (1973). Finders are not involved "in negotiating the price or any of the other terms of the transaction." *Sullivan v. Hopkins,* 435 F.2d 1128, 1131 (9th Cir. 1970). This "distinction between a finder (who finds, interests, introduces and brings the parties together for the deal which they themselves negotiate and consummate) and a broker (whose duty is to bring the parties to an agreement on his employer's terms) has been noted in all the decisions dealing with the subject (citations omitted)." *Ames v. Ideal Cement Co.,* 37 Misc. 2d 883, 886, 235 N.Y.S. 2d 622, 625 (Sup. Ct. 1962). Thus, the finder's contract is "an arrangement by which an intermediary finds, introduces, and brings together parties to a business opportunity, leaving the ultimate negotiation and consummation of the business transaction to the principals." Annot., *Validity, Construction, and Enforcement of Business Opportunities or "Finder's Fee" Contract,* 24 A.L.R. 3d 1160, 1164 (1969).

In applying the rather tenuous distinction between these terms to the facts of this case we must, of course, view the evidence in the light most favorable to the plaintiff and give it the benefit of all reasonable inferences deducible therefrom. *E.g., Herron v. Silbaugh,* 436 Pa. 339, 260 A.2d 755 (1970), *Eldridge v. Melcher,* 226 Pa. Superior Ct. 381, 313 A.2d 750 (1973); *Rumsey v. The Great Atlantic & Pacific Tea Co.,* 408 F.2d 89 (3d

Cir. 1969). In so doing it is clear that the jury reasonably could have found that Amerofina was engaged as a finder and was not obligated to negotiate as an agent of USI. Garvin testified that under the terms of the oral contract he was hired as a finder, and the issue of his credibility was for the jury, *Walker v. Martin,* 214 Pa. Superior Ct. 287, 257 A.2d 619 (1969), which accepted his version of the facts. Additionally, the subsequent conduct of the parties is a persuasive indicator of their original intent. *Westinghouse Elec. Co. v. Murphy, Inc.,* 425 Pa. 166, 228 A.2d 656 (1967) ; *see* Restatement of Contracts, §235(e) (1932). The evidence shows that although Garvin did something more than introduce and bring together the parties in the Berkeley and Finance deals, he was not authorized to and did not negotiate or participate in negotiating either of those acquisitions on behalf of USI, and both acquisition agreements denoted the fee paid to Amerofina as a "finder's fee." The services performed by finders vary from case to case, *Sullivan v. Hopkins,* supra, and we cannot say that the additional incidental activities performed by Garvin in the Berkeley and Finance acquisitions changed his role to that of a broker. We conclude, therefore, that the evidence was sufficient to find and that the jury reasonably could have found that Amerofina was employed by USI as a finder and that any fee which might accrue would do so if and when Amerofina performed such services.

## II

The questions remaining go to the extent of the services required to be performed by a finder before he is entitled to his fee and whether Amerofina performed such services in this case.

"It is generally held, in the absence of an inconsistent contractual mandate, that a finder who is employed to find a buyer or seller of a business has performed all services necessary to entitle him to a commission if

(1) He introduces his employer to a buyer or seller with whom the employer consummates a merger or acquisition; and

(2) The transaction directly results from the introduction." Fox & Fox, supra at §30.04 [1]. *See Tyrone v. Kelley,* supra.

Thus one who merely introduces the parties and supplies information is a finder. *Ames v. Ideal Cement Co.,* supra. This can, of course, be accomplished with minimal active performance. "It is possible for a finder to accomplish his service by making only two phone calls and, if the parties later conclude a deal, he is entitled to his commission." *Minichiello v. Royal Business Funds Corp.,* 18 N.Y.2d 521, 527, 223 N.E.2d 793, 796, 277 N.Y.S. 2d 268, 272 (Ct. App. 1966), *cert. denied,* 389 U.S. 820 (1967). In *Freeman v. Jergins,* 125 Cal. App. 2d 536, 271 P.2d 210 (1954) the finder completed his services when he introduced the parties. The court held in *Bittner v. American-Marietta Co.,* 162 F. Supp. 486, 488 (E.D. Ill. 1958) that "[a]ll the 'finder' is required to do is to bring the seller to the attention of the purchaser."

There must be, however, a causal connection between the activities of the finder and the resultant acquisition or merger. It is generally said that the middleman must be the efficient procuring cause of the transaction. This rule, generally stated in brokerage cases, *see, e.g., Lipper v. Tubis,* 422 Pa. 245, 220 A.2d 875 (1966) (real estate broker); *Helmig v. Rockwell Mfg. Co.,* 380 Pa. 305, 111 A.2d 118 (1955) (industrial materials broker), has in at least one instance been applied to the business opportunities or finders transaction. *Modern Tackle Co. v. Bradley Indus., Inc.,* 11 Ill. App.3d 502, 297 N.E.2d 688 (1973). However, "it is clear that a finder's fee is not dependent upon the finder's participation in negotiations, and that it may become payable even though a third

person brings the parties to agreement." *Fox & Fox,* supra at §30.04 [3]. It may be noted that the usual brokerage commission cases are not necessarily on point. In the brokerage case the broker must be the procuring cause of a ready, willing and able buyer who purchases on the terms and at the price designated by the principal. The finder, however, is engaged to do something less. One court has stated that the finder must be "the one who sets the chain of events in motion which result in the sale." *Consolidated Oil & Gas, Inc. v. Roberts,* 162 Colo. 149, 158, 425 P.2d 282, 286 (1967). The New York Court of Appeals in *Simon v. Electrospace Corp.,* 28 N.Y.2d 136, 269 N.E.2d 21, 320 N.Y.S.2d 225 (Ct. App. 1971) affirmed the award of a finder's fee where "the evidence, albeit contradicted, . . . sufficed to establish a continuing connection between plaintiff's initial efforts and the merger that came about." *Id.* at 142, 269 N.E.2d at 24, 320 N.Y.S.2d at 229.

The court in the case before us charged the jury in terms of "direct and efficient cause" and "immediate, efficient, and procuring cause." The judge stated:

"[i]f a finder introduces a prospective buyer and seller who enter upon merger negotiations which are suspended and later resumed, the finder is still entitled to a fee if the renewed negotiations . . . directly result from the original introduction. If the original introduction continues to be the direct and efficient cause of what happened.

". . . a finder may recover a fee or commission even if the buyer or seller he introduces to his principal is not interested in completing the transaction on the principal's terms at the time of introduction, when such an interest subsequently develops. . . . otherwise, however, if during that time lapse an intervening force comes into the picture and it is this intervening force which brings about the ultimate result.

"The term 'procuring cause' . . . means more than a mere 'but for' causation. It refers to a cause originating a series of events which without break in their continuity result in an accomplishment of the objective of arriving at an agreement concerning the acquisition between the acquiring and the selling company."

We are convinced that guided by the charge and the evidence the jury could find that Amerofina was the "procuring cause" of the Health acquisition. Its conclusion in tracing a continuing connection between Amerofina's preliminary ground work and the final acquisition cannot be said to be without basis. Garvin testified that the original proposition was presented as a dual acquisition; that after the Finance closing he spoke with Kerr "quite often" (Record at 135a) ; that he made a June, 1969, trip to California "to move the [Health acquisition] forward" (*id.*) ; that after the trip he reported to Kerr who responded, "good, Sam, because we're still very interested in Health Industries" (Record at 143a) ; and that he continued to discuss it with Kerr (Record at 144a). These activities show more than "remote, unrelated and noncontributory" efforts, *Pass v. Industrial Asphalt of Cal., Inc.,* 239 Cal. App. 2d 776, 49 Cal. Rptr. 190 (1966), and would permit a jury to find a "continuing connection." *Simon v. Electrospace Corp.,* supra.

In addition the parties to the merger by their acts acknowledged Amerofina's role in the Health acquisition. Wilson, a principal shareholder in Health, took the precaution of having Garvin sign a letter intending to release Health from any liability for a finder's fee and stating that Garvin represented only USI. More importantly there is evidence in addition to and quite apart from Garvin's testimony from which it may be inferred that Kerr himself thought that Garvin was entitled to be paid. As stated before, subsequent conduct of the parties is relevant in determining their original intent.

In conclusion we find upon a review of the facts and the law that the evidence was sufficient for the jury to reasonably conclude that USI entered into an enforceable oral business opportunities contract with Amerofina wherein USI agreed to compensate Amerofina for its services as a finder as that term is used generally in both business and law; and sufficient for it to conclude that Amerofina had performed those services which directly resulted in the Health acquisition.

Judgment affirmed.