## Crowe Insurance Agency Inc. v. Insurers Nat'l. Search Organization Inc.

*Harry St. C. Garman,* for plaintiff.
*Joseph M. Donley,* for defendant.

ECKMAN, *J.;* February 22, 1984 — On July 30, 1982, plaintiffs, Crowe Insurance Agency Inc. and Engle-Hambright & Davies Inc. (hereafter Crowe and E.H. & D., respectively), filed a complaint in equity seeking a declaratory judgment against defendant, Insurers National Search Organization Inc. (hereafter INS). Plaintiffs contend that INS acted as their agent and therefore they do not owe any commission to INS on the sale of Crowe to E.H. & D. In the alternative, plaintiffs request that the court determine which plaintiff, if any, owes a com-

mission and the amount owed. INS filed an answer and new matter on August 20, 1982.

In the new matter, INS contends that it acted as a finder and not as an agent and therefore is entitled to a commission from both plaintiffs. INS seeks a declaration that plaintiffs are obligated to pay INS in accordance with their agreements with INS. Plaintiffs filed an anwer to new matter on September 8, 1982. On March 10, 1983, the action between E.H. & D. and INS was settled, discontinued and ended by agreement of those parties. After trial between plaintiff, Crowe Insurance Agency, Inc. and INS on October 26, 1983 and transcription of the record, the matter is now before the court for disposition.

After consideration of the evidence, we enter the following

## FINDINGS OF FACT

1. Plaintiff, Crowe Insurance Agency Inc., is a Pennsylvania corporation engaged in the business of operating an insurance agency, with offices at 169 Washington Street, East Stroudsburg, Pa.

2. Defendant, Insurers National Search Organization Inc., is a corporation with offices at 2826 I.V.B. Building, 1700 Market Street, Philadelphia, Pa. INS engages in personnel recruiting and specializes in insurance personnel but also deals with mergers and acquisitions.

3. Richard C. McClelland, an adult individual residing in Pinehurst, N.C., worked for Crowe beginning in 1972. He held the position of vice president in 1978, and became president in 1980. At the date of the sale of Crowe, McClelland was the agency's sole stockholder.

4. Robert F. Marren, an adult individual residing at 300 Seybrook Road, Villanova, Pa., is the president of INS and has held that position since the organization came into existence in 1970.

5. Marren contacted McClelland in November 1981, relative to merging or selling Crowe. Marren informed McClelland that market conditions were such at that time that it might be advisable to wait until after the first of the year to anticipate a sale, but that Marren would pursue the idea of merging or selling.

6. Marren contacted McClelland on January 26, 1982, as a follow-up to his previous suggestion. Marren informed McClelland that he had several prospects who were interested in the purchase of an agency similar to Crowe. Marren obtained general information concerning Crowe, explained his services in detail, and discussed his commission arrangement. McClelland advised Marren that only one fee should be paid to INS in the event of sale.

7. Marren sent McClelland a letter dated February 1, 1982, confirming the telephone conversation of January 26, 1982. McClelland noted several inaccuracies contained in the letter, as well as terms that had not been discussed by the parties. The last paragraph on page 1 of the letter states:

"In addition to confirmation of the above, your signature below reaffirms our agreement regading Insurers National Search's service charge connected with this transaction. Contingent upon our ability to locate, and arrange a personal meeting with a prospective buyer, resulting in a Sale, Merger, or other acquisition of your Agencies, each agency so sold merged and/or acquired, singularly and jointly, is responsible for payment to Insurers National Search, as a Finder's Fee, in an amount equal to five percent of the Purchase Price on any amount up to the First $1,000,000; and, four percent of the second $1,000,000. For example: one and one-half times annual commission is equal to a purchase price of $1,800,000; thereby resulting in a finder's

fee of $82,000." (Emphasis supplied.) McClelland informed Marren of the inaccuracies in a telephone conversation on February 4 or 5. McClelland did not sign the letter or return it to Marren.

8. In a telephone conversation following the February 1, 1982 letter, Marren asked McClelland not to mention the commission to prospective buyers.

9. On February 2, 1982, Marren sent a document entitled "Agency Sales Particulars" to E.H. & D., Lancaster, Pennsylvania, with terms similar to the letter sent to McClelland. The last paragraph on the page states:

*"Buyer will agree to pay Insurers National Search, a Finder's Fee equal to Five Percent of the Agreed Purchase Price.* This amount to be paid at closing regardless of the agreed payment method employed by the seller and buyer. A 'Letter Agreement' between INS and prospective buyer, guaranteeing payment of this finder's fee, will enable INS to identify the seller, and arrange a personal meeting with seller." (Emphasis supplied.)

10. Edward P. Jaeger, senior vice president and head of acquisitions and mergers for E.H. & D., verbally agreed to protect the fee in a telephone conversation with Marren on February 10, 1982, and by letter dated February 10, 1982, Marren informed Jaeger that the Crowe Agency was for sale.

11. Marren told Jaeger that his services to E.H. & D. would include getting the parties together, arranging meetings, and offering any help necessary to carrying through negotiations with McClelland.

12. McClelland met with Marren in Philadelphia on February 18, 1982. Marren produced the names of three prospective purchasers for McClelland. McClelland verbally agreed to pay Marren's commission conditioned upon the seller's commission being the only one charged. McClelland signed the

second page of a copy of the letter of February 1, 1982.

13. Marren informed McClelland that his services would include contacting prospective purchasers, and he offered to attend meetings to help work out any problems which might arise.

14. Marren arranged meetings between McClelland and representatives of, inter alia, E.H. & D. on March 1, 1982. Marren did not attend any such meetings.

15. Marren contacted as many as fifteen organizations concerning a possible sale. He telephoned McClelland frequently, reporting on the status of financial negotiations between E.H. & D. and Hartford Insurance Co., and reported on other information that he received from organizations that he contacted.

16. Christian McMurtrie, President of E.H. & D., and Jaeger first learned that the seller would be paying Marren a sales commission at their March 1, 1982, meeting with McClelland. Both McMurtrie and Jaeger had thought that E.H. & D. was to pay the only commission. Marren had not expressly told the representatives of E.H. & D. that there was to be only one fee.

17. On McClelland's behalf, Marren told E.H. & D. that a letter of intent was needed. He also suggested to McClelland that a deposit be requested.

18. Marren contacted E.H. & D. frequently throughout the negotiations up to the point when it was discovered that two commissions were to be paid.

19. McClelland met with McMurtrie and Jaeger on April 19, 1982. The E.H. & D. representatives asked McClelland for the details concerning the sale, specifically regarding the commission arrangements. McClelland reiterated that there was to be

only one fee paid and that he was going to pay it. Jaeger revealed to McClelland that E.H. & D. had also contracted to pay a fee of 5 percent. This was the first time McClelland had learned that the buyer also was paying a fee.

20. McClelland telephoned Marren shortly after the April 19 meeting with E.H. & D. Marren initially denied that the buyer was paying a commission, but finally admitted that the buyer was paying a fee. Marren told McClelland that he would work it out and not to be concerned about it. Jaeger also called Marren to discuss the commission situation, and Marren told him that there were two fees to be paid.

21. McClelland continued negotiations with E.H. & D. after learning of the dual fee agreement.

22. McMurtrie viewed Marren as a "go-between" or intermediary since Marren did not participate in the material negotiations of the sale. When E.H. & D. requested information concerning Crowe, Marren would obtain it. Jaeger assumed that Marren was operating under McClelland's authority.

23. Marren had no authority to negotiate for E.H. & D., nor was he specifically authorized to commit E.H. & D.

24. Marren did not arrange the financing for E.H. & D. to purchase Crowe.

25. Marren did not have authority to sell Crowe on behalf of McClelland, but he did suggest terms and conditions for the sale based on his experience.

26. McClelland wrote to Marren on May 22, 1983, stating that Marren had breached their agreement and that any further communications would come through his attorney.

27. Attorneys-at-law for E.H. & D. and Crowe negotiated the purchase price on July 7, 1982. McClelland's attorney did not have the authority to

agree to terms without consultation with McClelland.

28. As a result of the meeting arranged by INS between representatives of Crowe and E.H. & D., and subsequent meetings between their representatives, E.H. & D. entered into an agreement to purchase Crowe. The closing date for the transaction was August 2, 1982.

29. The parties stipulated at trial that the fee representing commissions, if found to be owed by Crowe to INS, is $89,600, plus interest from the date of the sale on August 2, 1982.

## ISSUES

1. Whether INS, through its President, Robert F. Marren, acted as an agent of Crowe, or in the capacity of a finder?

2. Whether the failure of INS to disclose to Crowe its commission arrangement with E.H. & D. precludes INS from recovering a commission from Crowe?

3. Whether INS breached an agreement with Crowe when it contracted with E.H. & D. for the payment of a second commission on the sale of Crowe?

## DISCUSSION OF FACTS AND LAW

Our resolution of these issues begins with an analysis of the law pertaining to an agent as distinguished from a finder. The Pennsylvania Supreme Court in Scott v. Purcell, 490 Pa. 109, 415 A.2d 56 (1980), noted that the basic elements of an agency relationship include:

". . . the manifestation by the principal that the agent shall act for him, the agent's acceptance of the undertaking and the understanding of the parties that the principal is to be in control of the un-

dertaking." 490 Pa. at p. 117, quoting Restatement (Second) of Agency, §1, Comment b (1958). An agent owes a duty to inform his principal of all facts or circumstances which may involve his conduct. State Real Estate Commission, et al. v. Miller, 21 Pa. Commw. 483, 346 A.2d 861 (1975). The burden of establishing an agency relationship lies with the party asserting it, and evidence of specific authority can be inferred. Scott v. Purcell, supra.

An agent cannot represent two principals, subject to two exceptions: where there is no conflict between the duties owed to the respective principals, and when the principal knows and consents. Onorato v. Wissahickon Park Inc., 30 Pa. 416, 244 A.2d 22 (1968).

A "finder" is distinguished from a broker who is regarded as an agent:[1]

"Such distinction as exists between these two terms is more a matter of trade usage than legal definition. In general, a finder is an independent actor whose role is that of a middleman who introduces the parties, supplies information to one or both about the other and is required to do little else, whereas a broker 'negotiates on behalf of one of the parties or performs or is required to perform some other act identified with the interests of one party and against the interest of the other.' 13A Business Organization, Fox & Fox, Corporate Acquisitions and Mergers, §30.02 (1974). 'The finder is a person whose employment is limited to bringing the parties together so that they may negotiate their own contract, and the distinction between the finder and the

---

1. 13B Business Organizations, Fox & Fox, Corporate Acquisitions and Mergers, §30.01. See Brown v. Zortman Machinery Company v. Pittsburgh, 375 Pa. 250, 100 A.2d 98 (1953).

broker frequently turns upon whether the intermediary has been invested with authority or duties beyond merely bringing the parties together, usually the authority to participate in negotiations.' " (Citations omitted.) Amerofina v. U.S. Industries, 232 Pa. Super. 394, 399-400, 335 A.2d 448 (1975). The finder acts as an intermediary, introducing and bringing parties together. The principals are left to do the ultimate negotiating and consummate the transaction. Amerofina v. U.S. Industries, supra. See Sachs v. Continental Oil Company, 454 F. Supp. 614 (E.D., Pa. 1978).

A finder is not an agent of the parties and does not occupy a fiduciary relationship with his employer. Courts in other jurisictions outside of Pennsylvania have held that a finder may represent both the seller and the buyer and obtain agreements so as to be compensated by both parties, even without disclosure of such a relationship. See 13B Business Organizations, Fox & Fox, Corporate Mergers and Acquisitions, §30.05[4].[2]

A finder is ordinarily entitled to a commission when:

"(1) He introduces his employer to a buyer or seller with whom the employer consummates a merger or acquisition; and

(2) The transaction directly results from the introduction." Fox & Fox, supra, at §30.04[1].

---

2. See McConnell v. Cowan, 44 Cal. 2d 805, 285 P.2d 261 (1955); Benway v. Cole, 99 N.H. 51, 104 A.2d 734 (1954). An exception to the general rule of finders not disclosing dual representation applies under circumstances when a finder should know that disclosure would influence negotiations. Fox & Fox, supra, §30.05[4]. See Myersburg v. Webster, 269 App. Div. 65, 53 N.Y.S. 2d 649 (1st Dep't 1945), aff'd 295 N.Y. 870, 67 N.E. 2d 514 (1946).

Amerofina v. U. S. Industries 232 Pa. Super. at p. 402.

In Amerofina v. U.S. Industries, supra, the court found that the evidence was sufficient to find that Amerofina was employed as a finder under an oral agreement where its representative was not authorized and did not negotiate or participate in negotiations, and the agreement terms the fee to be paid as a "finder's fee." Incidental activities performed by the finder did not convert his role into that of a broker.

Instantly, we believe that Crowe has failed to carry the burden of establishing an agency relationship, Scott v. Purcell, supra, and that the evidence establishes that INS (Marren) was employed by Crowe as a finder and performed accordingly. The contract signed by McClelland with INS termed INS a finder. It is clear that Marren acted as an intermediary who introduced the parties, supplied information about one party or the other and was required to do little else. Although Marren offered to attend negotiation meetings, he was not invited to do so. Marren had no authority to negotiate for McClelland, nor did he, and he did not commit McClelland on any material issues. Marren performed principally by supplying incidental services to McClelland, the nature of which generally comprised the relaying of information. Basically, the same status applies to Marren's relationship with E.H. & D.

Furthermore, we believe that even though contracts for sales commissions were made with both Crowe and E.H. & D., this fact did not alter the role of INS as a finder and did not result in the breach of a fiduciary relationship. Although Marren did not disclose his fee arrangements with E.H. & D. to McClelland, nor with McClelland to E.H. & D., his

deliberate failure to do so does not destroy the rights of INS (Marren) to a commission from both parties since Marren, as a finder, introduced Crowe and E.H. & D. The sale of Crowe resulted directly from that introduction. Amerofina v. U.S. Industries, supra. In so holding, we do not in any way condone Marren's conduct and find it was less than straightforward with both McClelland and E.H. & D. Nevertheless, once the parties discovered tht dual sales commissions were to be paid, the parties continued to negotiate and did consummate the transaction. Thus, the disclosure of the two commissions ultimately had little effect, if any, on the final transaction.

Next, we consider whether defendant's oral representations to Crowe that only one fee was to be charged and his subsequent actions contrary to those representations resulted in breach of his written contract with Crowe.

In determining whether a written agreement supersedes on oral one:

". . .'it is necessary to consider whether the parties situated as were the ones interested in the contract would naturally and normally include the one in the other. If they relate to the same subject matter and are so interrelated that both would naturally be executed at the same time in the same contract, the scope of the oral agreement must be considered as covered by the writing.'" National Cash Register Company v. Modern Transfer Co Inc., 224 Pa. Super. 138, 143-144, 302 A.2d 486 (1973), quoting Henry on Evidence, §604, page 31. The Pennsylvania Supreme Court in Scott v. Bryn Mawr Arms, 454 Pa. 304, 312 A.2d 592 (1973), stated:

"All preliminary negotiations, conversations and verbal agreements are merged in and superseded by the subsequent written contract . . . and unless

fraud, accident or mistake be averred, the writing constitutes the agreement between the parties, and its terms cannot be added to nor subtracted from by parol evidence." (Citations and quotations omitted.) 454 Pa. at p. 307.

Both McClelland and Marren were businessmen of relatively equal bargaining stature, but imprecise in their reduction to writing of their negotiations on a relatively large sum of money. McClelland's understanding of the oral agreement with Marren that only one fee was to be paid to INS was not subsequently contained in the written agreement between the parties. The agreement only stated the schedule of commissions in the event of a sale. Hence, we find that the oral agreement was superseded by the written contract, and since it does not expressly prohibit the payment of a fee to INS by the buyer as well as the seller, defendant did not breach the contract.

## CONCLUSIONS OF LAW

1. The court has jurisdiction of the within subject matter and of the parties.

2. Defendant was not an agent of plaintiff, Crowe Insurance Agency Inc., but was employed and performed as a finder.

3. Defendant, as a finder, did not violate a duty to plaintiff, Crowe Insurance Agency Inc., by contracting with Engle-Hambright & Davies Inc. for a separate commission.

4. Prior or contemporaneous negotiations between plaintiff, Crowe Insurance Agency Inc., and defendant were merged into the written agreement between them and did not prohibit the payment of a fee by both the seller and the buyer.

5. Defendant is entitled to be paid the commission of $89,600.

6. Costs ought to be imposed on plaintiff.

## DECREE NISI

And now, February 22, 1984, pursuant to the foregoing findings of fact and conclusions of law, it is hereby ordered that:

1. Plaintiff, Crowe Insurance Agency Inc., owes and shall pay defendant, Insurers National Search Organization Inc., the sum of $89,600, plus interest from the date of the sale on August 2, 1982, representing the commission due defendant pursuant to the agreement between the parties.

2. Plaintiff shall pay the costs of these proceedings.

3. If no exceptions are filed within 10 days after notice of the filing of this adjudication, this decree nisi shall be entered by the prothonotary, upon praecipe, as the final decree.